UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

19   2003
MAY 19 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

RANDALL AMADO,

        Petitioner,

vs.

EDWARD S. ALAMEIDA, JR.

        Respondent.

CASE NO.   CV 03-00078-PA (E)

NOTICE OF FILING OF MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION AND THE LODGING
OF PROPOSED JUDGMENT AND/OR ORDER

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

TO:  All Parties of Record

Randall Amado
P-28942
P.O. Box 1050
Soledad, CA 93960-1050

David A. Wildman
Deputy Attorney General
300 S. Spring St.
Los Angeles, CA 90013

You are hereby notified that pursuant to the Local Rules Governing Duties of Magistrate
Judges, the Magistrate Judge's report and recommendation has been filed  and a proposed
judgment and/or order has been lodged on May 16, 2003, copies of which are attached.

Any party having objections to the report and recommendation and the proposed judgment
and/or order shall, not later than 20 days, file and serve a written statement of
objections with points and authorities in support thereof before the Honorable CHARLES
F. EICK, U.S. Magistrate Judge.

Failure to so object within the time limit specified shall be deemed a consent to any
proposed findings of fact.  Upon receipt of objections, or upon the lapse of the time for
filing objections, the case will be submitted to the District Judge for disposition.
Following entry of judgment and/or order, all motions or other matters in the case will
be considered and determined by the District Court Judge.

The Report and Recommendation of a Magistrate Judge is not a final appealable order.  A
Notice of Appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1) should not be
filed until entry of a judgment and/or order by the District Judge.

Dated: May 19, 2003

CLERK, UNITED STATES DISTRICT COURT

By _____
Stacey Pierson
Deputy Clerk

Attachments

M-51(6/98)      NOTICE OF FILING MAGISTRATE JUDGE'S REPORT AND
          RECOMMENDATION AND THE LODGING OF PROPOSED JUDGMENT AND/OR ORDER



ENTERED ON ICMS

MAY 20 2003

CV

MAY 20 2003

```
                                          FILED
                               CLERK, U.S. DISTRICT COURT

                                     MAY 16 2003

                               CENTRAL DISTRICT OF CALIFORNIA
                               BY                    DEPUTY
```

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  RANDALL AMADO,                    )   NO. CV 03-00078-PA(E)
                                      )
11              Petitioner,           )
                                      )
12                                    )   REPORT AND RECOMMENDATION OF
                                      )
13  EDWARD S. ALAMEIDA, JR.,          )   UNITED STATES MAGISTRATE JUDGE
                                      )
14              Respondent.           )
                                      )
15  _____  )

16

17       This Report and Recommendation is submitted to the Honorable

18  Percy Anderson, United States District Judge, pursuant to 28 U.S.C.

19  section 636 and General Order 01-13 of the United States District

20  Court for the Central District of California.

21

22                            PROCEEDINGS

23

24       Petitioner filed a "Petition for Writ of Habeas Corpus By a

25  Person in State Custody" on January 6, 2003 ("Pet."), accompanied by

26  a Memorandum of Points and Authorities ("Pet. Mem.") filed on

27  January 24, 2003.  Respondent filed an Answer on February 26, 2003

28  ("Ans.").  Petitioner filed a Traverse on March 19, 2003 ("Trav.").

**BACKGROUND**

Robert Johnson, Wilbert Pugh and Petitioner were tried for crimes arising out of a gang-related shooting into a bus.  This shooting caused the death of Corie Williams and the wounding of Tammy Freeman. The prosecution's theory was that Johnson had fired shots into the back of the bus, and that Pugh and Petitioner had aided and abetted the shooting.

A jury convicted Petitioner of one count of first degree murder in violation of California Penal Code section 187(a), one count of attempted murder in violation of California Penal Code sections 664(a) and 187(a), one count of assault with a firearm in violation of California Penal Code section 245(a)(2), and one count of shooting into an occupied vehicle in violation of California Penal Code section 246 (Reporter's Transcript ["R.T."] 1700-02; Clerk's Transcript ["C.T."] 813-16, 823-25).  The jury found true the allegation that a principal was armed with a firearm within the meaning of California Penal Code section 12202(a) (R.T. 1700-02; C.T. 813-15, 823-25).  The court sentenced Petitioner to a total term of twenty-seven years to life (R.T. 1763-64; C.T. 870-72).

The Court of Appeal affirmed the judgment (Ans., Ex. A).  The California Supreme Court denied Petitioner's petition for review (Ans., Ex. C).

///

///

///

1    **SUMMARY OF TRIAL EVIDENCE**

2

3        In January, 1997, MTA bus number 3425 traced route number 53

4    through the territories of two rival Los Angeles gangs.  The bus

5    stopped at Centennial High School, which is located in territory

6    claimed by the "Bounty Hunter Bloods," a gang whose signature color is

7    red (R.T. 354, 356-57, 412, 434-35, 554, 1301-02).  The route also

8    took the bus through territory claimed by the "East Coast 118 Crips,"

9    a gang long a rival of the Bounty Hunter Bloods (R.T. 886-87, 1299-

10   1302).

11

12       The nature of this bus route had generated problems prior to the

13   shooting in question.  Members of the rival gangs had insulted each

14   other for years in exchanges called "banging" or "gang banging" (R.T.

15   569, 573-74, 576, 887).  As the bus passed through Crips' territory,

16   passengers who were Bounty Hunter Bloods would display gang signs,

17   actions the Crips considered disrespectful (R.T. 412-13, 563, 569,

18   574, 887).  One Blood passenger had spit at Crips, or thrown things at

19   them (R.T. 689-90).

20

21       On January 15, 1997, Pugh and Johnson, both Crips, discussed the

22   problems sometimes caused by Bloods on MTA bus route 53.  Pugh and

23   Johnson devised a plan, to be executed the following day, to board the

24   bus, beat up Bloods, and then exit the bus at the next stop (R.T. 894-

25   900, 913-14, 919-20, 928).

26

27       On the afternoon of January 16, 1997, Corie Williams boarded

28   bus 3425 with her friend Tammy Freeman, a senior at Centennial High

                                      3

School (R.T. 409, 411).  Other students, some of whom were Bounty Hunter Bloods, and most of whom wore red clothing, also boarded the bus (R.T. 357, 411-12, 433-35, 563-64).  One of these students was Tyrone Lewis, who wore a red shirt (R.T. 543-44, 547).  Lewis sat in the back of the bus, near some Bounty Hunter Bloods (R.T. 544, 563).

As the bus neared a stop in Crips' territory, a group of young men walked or ran across the street toward the bus (R.T. 723-24, 737, 1299-1300).  By the time the bus stopped at the bus stop, the group of young men, some of whom were Crips, were waiting at the stop (R.T. 359, 377, 413, 426-27, 435-36).  A member of the group, whom one witness identified as Pugh, entered the front door of the bus, identified himself as a Crip, and shouted epithets such as "fuck all slobs"[1] and "B.K. [Blood killer] for life" (R.T. 414, 421, 436-37, 546-47, 725, 728, 1306-07).  Another man shouted "Shoot this mother fucking bus up" (R.T. 677).  One man pointed at Lewis while saying "slob" (R.T. 547-58).

The young men who had shouted the threat and the epithets then exited the bus (R.T. 437, 450-51, 677-78).  As the bus pulled away from the bus stop, Johnson put a pistol through a back window of the bus and fired several times (R.T. 678-79, 713, 825, 830-31, 853).  Bullets struck Corie Williams and Tammy Freeman (R.T. 417, 419).  Johnson and the group of young men near the bus all ran away in the same direction (R.T. 680-81).

///

---

[1]     Crips sometimes refer to Bloods by the derogatory term "slobs" (R.T. 414, 547, 676, 1306).

1    Corrie Williams died of a gunshot wound to the neck (R.T. 534).

2 Tammy Freeman suffered a bullet wound to her upper arm (R.T. 417,

3 419).

4

5    Gracie McKenzie called police that day (R.T. 586-87).  McKenzie

6 told police that, before the shooting, she had seen a group that

7 included Pugh, Johnson and Petitioner's brother a few blocks from the

8 bus stop (R.T. 588, 591-92, 595, 606, 655, 902).  Three members of the

9 group, including Pugh and Petitioner's brother, reportedly were armed

10 (R.T. 592).  McKenzie said the members of the group, except for

11 Petitioner's brother, were "11-8 East Coast" (R.T. 594).  McKenzie

12 reportedly heard Pugh and Johnson say they were going to "go to get

13 someone, or take care of something" (R.T. 588).  McKenzie said the

14 group then headed toward the intersection where the bus stop was

15 located (R.T. 588, 595-598).  According to McKenzie, when the group

16 came running back after the shooting, they were laughing (R.T. 597,

17 606).  McKenzie told police she heard someone say they "got this girl.

18 We got somebody" (R.T. 599-600, 607).  McKenzie told police that

19 Petitioner, who used the nickname "Bang," was not in the group (R.T.

20 617-19, 621, 656).

21

22    McKenzie was an extremely reluctant trial witness (R.T. 465-523).

23 However, she did testify she knew all three defendants and knew they

24 were gang members (R.T. 475-76).  McKenzie testified Pugh was a member

25 of the East Coast 118 gang, but said she did not know the name of the

26 gang Petitioner was in, and later said she did not know if Johnson was

27 in a gang (R.T. 476-77).  McKenzie also testified Petitioner's

28 nickname was "Bang" (R.T. 492-93).  McKenzie testified that, on the

day of the shooting, McKenzie saw Johnson and Pugh talking with a group of people, and heard Pugh say "Y'all ready?" (R.T. 477-79). After the group left, McKenzie heard gunshots (R.T. 509-10). McKenzie said she told police one of the men in the group had a gun (R.T. 506). However, McKenzie denied making earlier, tape-recorded statements to police, testified her statements to police were untrue, and testified she did not know anything about the case (R.T. 487-88, 507, 511-14, 522-23).

John Grisson told police he saw Petitioner "running with the group of kids who shot at the bus" (R.T. 729-30, 766). Grisson also told police someone in the group had a gun, and said he saw Petitioner running with the group after the shooting (R.T. 963-65, 1161, 1213). At trial, Grisson testified Petitioner was part of the group Grisson saw prior to the shooting, but said he had not seen Petitioner running away from the bus (R.T. 765-66, 788, 793-95, 799).

Tasha Barner said she knew Pugh, Johnson and Petitioner, and had seen Petitioner and Pugh together a couple of times at Barner's apartment (R.T. 823-24, 839). Barner reportedly witnessed the shooting (R.T. 825-31). Barner said Petitioner was in the group that approached the bus (R.T. 833-34, 838-39). Barner said she also saw Petitioner behind the back of the bus (R.T. 854).

Nicholas Briggs said he grew up with Pugh and Johnson, and knew them as members of the 118 East Coast Crips (R.T. 883-86). Briggs said he was friends with Petitioner, and previously had seen Petitioner in the company of members of the Imperial Block Crips gang,

1  a gang whose members became members of the 118 East Coast Crips (R.T.

2  883-85, 944).  The day after the shooting, Briggs was with Petitioner,

3  drinking and talking, when the police arrested Briggs and Petitioner

4  (R.T. 907-08).[2]

5

6      The day after the shooting, a man identifying himself as "Warren

7  Collins" contacted police (R.T. 983, 998-99, 1070-73).  Collins' real

8  name is Warren Hardy (R.T. 983).  Hardy told police he heard some

9  people outside the apartments behind Hardy's home laughing and talking

10  about the shooting (R.T. 998).  Hardy indicated they were the "same

11  guys" Hardy believed had done the shooting the preceding day (R.T.

12  998).  Police came to the scene and detained Petitioner and Briggs

13  (R.T. 956-57, 1001, 1008-09, 1073-74, 1148).

14

15      Interviewed by police, Hardy stated that, on the day of the

16  shooting, Hardy saw a light-skinned, chubby male black with a gun

17  behind the group (R.T. 1063, 1070-71, 1218-26).  After the shooting,

18  Hardy reportedly saw two people who had been with the group running,

19  and saw one or both of them change clothing (R.T. 1064-65, 1071).  The

20  next day, after police detained Petitioner and Briggs near Hardy's

21  home, Hardy identified Petitioner as the person he had seen with the

22  gun (R.T. 1072-74, 1090-91).

23

24      At trial, Hardy testified that, on the day of the shooting, Har

25  saw a group of boys walking at a fast pace up the street, including

26  "short chubby boy in the back with a handgun with a black handle"

27  _____

28      [2]  Briggs testified under a grant of immunity and was not
prosecuted in connection with the shooting (R.T. 870-73, 886).

(R.T. 985, 988-89, 1014, 1016, 1050-51).  After hearing shots, Hardy

saw what appeared to be the same group running (R.T. 985, 996-97).

However, Hardy said he could not identify Petitioner as the person

with the gun, and professed not to remember statements he had given to

police earlier (R.T. 985-86, 1000-04).  Hardy said he did not want to

testify and he was concerned for his safety (R.T. 1003, 1060).  Hardy

did testify that Hardy called police after he heard some people

laughing and "bragging about the shooting" (R.T. 998, 1008, 1015,

1048-49).  On cross-examination by Petitioner's counsel, Hardy

admitted he was "farsighted" and needed glasses, but said his eyesight

was "not that bad" (R.T. 1045-46).  Petitioner's counsel also elicited

Hardy's testimony that, in an interview with Pugh's counsel, Hardy was

shown Petitioner's photograph but Hardy then said he did not recognize

Petitioner (R.T. 1056-58).

A police gang expert testified concerning gang culture and the

rivalry between the Crips and the Bloods.  According to the expert,

police gang affiliation records did not record Petitioner as a gang

member (R.T. 1337).

## PETITIONER'S CONTENTIONS

Petitioner contends:

1.  The prosecution allegedly violated <u>Brady v. Maryland</u>,[3] by

failing to disclose evidence that Hardy had suffered a prior robbery

---

[3]   373 U.S. 83, 87 (1963) ("<u>Brady</u>").

8

1   conviction, was on probation at the time he testified at Petitioner's

2   trial, and was a member of a Blood gang (Pet., p. 5);[4]

3

4        2.   The evidence allegedly was insufficient to support

5   Petitioner's convictions (Pet., p. 5);

6

7        3.   The trial court's instruction on the elements of the firearm

8   enhancement allegedly was unconstitutional (Pet., p. 6); and

9

10       4.   The trial court's use of CALJIC 2.90 allegedly

11  unconstitutionally failed to instruct the jury regarding the

12  prosecution's burden to prove every element of the charged offenses

13  beyond a reasonable doubt (Pet., p. 6).

14

15                              DISCUSSION

16

17       For the reasons discussed below, the Court should grant a

18  conditional writ of habeas corpus with respect to Petitioner's <u>Brady</u>

19  claim.

20

21  I.   <u>Standard of Review</u>

22

23       An application for writ of habeas corpus on behalf of a person in

24  state custody may not be granted with respect to any claim that was

25

26       [4]    Respondent appears to interpret Petitioner's <u>Brady</u>
    claim to include a "freestanding claim of actual innocence" (<u>see</u>
27  Ans., pp. 7-8).  The Court does not so interpret the Petition,
    which identifies the claim as a <u>Brady</u> claim.  Petitioner disavows
28  any "freestanding claim of actual innocence" (<u>see</u> Trav., p. 4).

1  adjudicated on the merits in state court proceedings unless the

2  adjudication of the claim: (1) "resulted in a decision that was

3  contrary to, or involved an unreasonable application of, clearly

4  established Federal law, as determined by the Supreme Court of the

5  United States"; or (2) "resulted in a decision that was based on an

6  unreasonable determination of the facts in light of the evidence

7  presented in the State court proceeding."  28 U.S.C. § 2254(d);

8  Woodford v. Visciotti, 123 S. Ct. 357, 360-61, 154 L.Ed.2d 279 (2002);

9  Early v. Packer, 123 S. Ct. 362, 364-66, 154 L.Ed.2d 263 (2002);

10  Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

11

12  II.   **The Prosecution Suppressed Material Impeachment Evidence in**

13        **Violation of Brady.**

14

15  A.    **Factual Background**

16

17        1.   **Pretrial Proceedings**

18

19       At Petitioner's preliminary hearing, Los Angeles police detective

20  Andrew Smith testified that, on January 17, 1997, he spoke several

21  times on the telephone with a person named "Warren Collins" (C.T. 86-

22  87).  According to Smith, "Collins" said that, on the day of the

23  shooting, "Collins" saw an individual with a handgun in his pocket

24  following a group running toward the intersection where the shooting

25  occurred (C.T. 87-88).  "Collins" said he heard shots a few minutes

26  later (C.T. 87-88).  "Collins" said he saw the individual with the gun

27  and another person jump over a wall into a yard and change clothing

28  (C.T. 88-90).  "Collins" reportedly called police on January 17

1 | because the two people he had seen jumping over the wall on the day of
2 | the shooting were next door (C.T. 88-90). Police responded to the
3 | call and detained Petitioner and another man (C.T. 133-35). "Collins"
4 | identified Petitioner as the person with the gun (C.T. 103-04).

6 | At Petitioner's arraignment on October 9, 1997, the court ordered
7 | that the investigating officer appear with the "entire discovery
8 | package" on the next scheduled court date, October 30, 1997 (R.T. 4-5;
9 | C.T. 212-13). On October 30, 1997, the prosecution produced the
10 | "complete murder book and discovery package," except for the addresses
11 | of prosecution witnesses, which the prosecution withheld on the ground
12 | the witnesses allegedly feared for their safety and that of their
13 | families (Reporter's Augmented Transcript of Proceedings on October
14 | 30, 1997 ["Oct. 30, 1997 R.A.T."] 1). During the ensuing discussion,
15 | Johnson's counsel indicated one of the witnesses was the person who
16 | had made observations while on his balcony and who subsequently called
17 | police, obviously referring to Hardy (Oct. 30, 1997 R.A.T. 6). The
18 | prosecutor indicated a willingness to make the witnesses available for
19 | defense interviews at a "neutral location" (Oct. 30, 1997 R.A.T. 3-4).
20 | The court initially ordered disclosure of the witnesses' addresses to
21 | defense counsel, but then granted the prosecution's request to hold a
22 | hearing on the issue (Oct. 30, 1997 R.A.T. 6-7).

24 | On November 6, 1997, the prosecution filed a motion to prevent
25 | disclosure of witness addresses and phone numbers, a motion not in the
26 | record (see C.T. 217). On November 6, 1997, Johnson's attorney filed
27 | opposition, representing that the defense had received the "murder
28 | book" but not the addresses or phone numbers of percipient witnesses

11

(C.T. 216-23).  At the hearing on November 7, 1997, several of the witnesses testified regarding their safety concerns (Pet. Ex. C). Hardy did not testify at this hearing (R.T. 39).  The court ruled that the prosecution did not have to disclose the witnesses' addresses or telephone numbers (R.T. 36-37).  Johnson's counsel argued, <u>inter alia</u>, that "Warren Collins" was a "<u>Brady</u> witness" for his client, and that the prosecutor had represented to counsel that she did not have a current address for "Collins" (R.T. 39).  Johnson's counsel sought an order requiring the prosecution to "determine which witnesses are potential exculpatory witnesses and . . . follow up," arguing the prosecution had "a lot more ability to follow up on finding these witnesses than I do" (R.T. 39).  The court said: "I'm sure that [the prosecutor] will do whatever she can to assist you to getting in touch with -- or make the people available.  Is that right?" (R.T. 40).  The prosecutor replied: "Yes, that's true, Your Honor." (R.T. 40).

## 2.    **Events During Trial**

On November 3, 1998, during voir dire, Johnson's counsel indicated he had been unable to obtain information concerning three potentially exculpatory witnesses, including "Warren Collins, or Warren Harding [sic]" (R.T. 112).[5]  Johnson's counsel said that a

---

[5]    The record contains a minute order, dated June 22, 1998, stating: "Warren Hardy, appearing in custody, is ordered to return on [date obliterated], 1998 . . . ." (C.T. 278).  The minute order indicates neither Petitioner nor his counsel were present when this order was made.  The record contains neither an explanation of Hardy's presence on June 22, 1998 nor any indication Hardy returned to court after June 22, 1998 and prior to trial.

1   prosecution investigator had told counsel the investigator was trying

2   to locate "Collins" (R.T. 113).  The prosecutor indicated the

3   prosecution was making "an effort to try to locate . . . Mr. Collins,

4   aka Hardy . . . ." (R.T. 116).  Discussing another potential witness,

5   Joseph Smith, Johnson's counsel stated: "I know the people have the

6   ability -- I certainly don't -- to look into their files and find any

7   identifying information, even for juveniles.  They can also run rap

8   sheets.  They have a lot of things they can run, D.M.V.'s, and they

9   have a lot of things that I can't do or my investigators can't do"

10   (R.T. 117).  The prosecutor stated he would have a detective run

11   Smith's rap sheet (R.T. 117).  At the hearing, no one mentioned

12   running the rap sheet of Warren Collins/Hardy.

13

14         On November 6, 1998, the court asked whether the defense had had

15   an opportunity to talk to the witnesses mentioned previously (R.T.

16   151-52).  Pugh's attorney indicated his investigator and those of

17   Petitioner had had an opportunity to speak with Grisson, and indicated

18   Warren Hardy had been present at the courthouse (R.T. 152).  It

19   appears from trial testimony that Pugh's attorney subsequently did

20   interview Hardy on November 6, 1998, but there is no indication

21   Petitioner's counsel then was present (R.T. 1202).  Johnson's attorney

22   asked the court to order Hardy back as a witness (R.T. 152).  The

23   court indicated a willingness to do so, but the record does not

24   reflect any such order (R.T. 152-53).

25

26         On November 9, 1998, Johnson's counsel again raised the issue of

27   the whereabouts of witness Joseph Smith, who allegedly had claimed to

28   be a "Blood" (R.T. 262, 266).  The prosecutor represented that the

1  prosecution had been unable to locate Smith and did not have Smith's

2  address (R.T. 263-64).  The court told the prosecutor to have the

3  investigating officer check "whatever books they have on Bounty

4  Hunters" (R.T. 266).  The next day, the prosecutor told the court the

5  prosecution had run Smith "through what is known as a gang computer"

6  and had checked with a police officer who was an "expert on Bounty

7  Hunter Bloods," but had been unable to locate Smith (R.T. 303).

8

9      During presentation of the prosecution's case, on November 12,

10  1998, Johnson's counsel advised the court that the prosecutor had told

11  counsel Smith was a Bounty Hunter Blood, but was in state prison (R.T.

12  524).  The court agreed to issue a removal order to secure Smith's

13  presence the following week (R.T. 524-25).  Pugh's counsel stated he

14  wanted discovery regarding Smith, who presumably had a felony record,

15  saying he had not received such information (R.T. 526).  Pugh's

16  counsel also indicated Nicholas Briggs apparently was incarcerated,

17  and sought "full information" about Briggs (R.T. 526).  The court

18  indicated counsel was "certainly" entitled to information about

19  Briggs' felony convictions, and told the prosecutor to provide the

20  defense "whatever you have available that you can make available to

21  the defense" (R.T. 526).

22

23      Hardy testified on November 17, 1998 (R.T. 982; C.T. 381).  At

24  the close of proceedings that day, the court ordered Hardy to return

25  the next day (R.T. 1020).  The next morning, the prosecutor indicated

26  there had been a "problem" with Hardy returning to court that morning,

27  because Hardy did not want to return (R.T. 1026).  Hardy subsequently

28  did return and did complete his testimony (R.T. 1044-61).

### 3.   Petitioner's Motion for a New Trial

The jury reached its verdict on December 1, 1998 (R.T. 1699-1703; C.T. 813-16, 823-25).  On January 14, 1999, Petitioner's counsel filed a motion for a new trial pursuant to California Penal Code section 1181, contending, inter alia, newly discovered evidence warranted a new trial (C.T. 832-38).  The alleged newly discovered evidence included information that Hardy had a prior felony record and was a "Blood" gang member (C.T. 837-38).  Petitioner's counsel submitted a declaration from Hardy, in which Hardy stated: (1) Hardy had a felony record at the time he testified in Petitioner's trial; (2) in 1997, in Los Angeles County Superior Court (Long Beach), Hardy was convicted of robbery; (3) Hardy was on probation at the time he testified in Petitioner's trial; and (4) at one time Hardy was a "Scottsdale Piru Blood (Carson)," (Pet. Ex. F, p. F-4).  The motion also indicated Hardy presently was awaiting trial on a murder charge, and asked the court to take that alleged fact into account "when considering the credibility and reliability of Mr. Hardy's statements" (C.T. 838).

At the January 25, 1999 hearing on the motion, the following occurred:

[Petitioner's counsel]:  So the real critical person in this case was a person by the name of Warren Hardy or Warren Collins.  Mr. Collins or Mr. Hardy was never available to us until the trial.  As a matter of fact, when he testified, he was excused and we couldn't get him back.  I tried numerous times to have the district attorney bring him back because I

1 | wanted to talk to him about his glasses, if the court would
2 | recall.
3
4 | And at that time I did not know -- there was [sic]
5 | certain things that were disclosed to me after that, after
6 | the trial and after he -- after he left, and I believe this
7 | newly discovered evidence is very, very critical to his
8 | credibility.
9
10 | The Court:  The newly discovered evidence being the fact
11 | that he has previously been convicted of a felony involving
12 | moral turpitude, was on probation, I believe, at the time
13 | that he gave testimony; a fact that nobody was aware of at
14 | the time he took the stand.
15
16 | [Petitioner's counsel]:  Also the fact that he was a Blood.
17 | This is a Blood/Crip situation.  If the court remembers,
18 | Mr. Hardy made a statement after -- one day after the event,
19 | and then when we got on the stand he didn't know nothing
20 | about anything.  So what the testimony -- we never did get
21 | any testimony under oath that he -- that Mr. Amado did
22 | anything other than the statement he made right after.
23
24 | He is a -- he is a Blood, his probation -- I just received
25 | his probation officer -- I just received his file on the
26 | robbery when he pled guilty in 1996 that indicated he was a
27 | Piru Blood.  That was -- of course the district attorney
28 | didn't know that.  These are [sic] newly discovered

1     evidence.

2

3  (R.T. 1729-30).

4

5     Later, Petitioner's counsel told the court:

6

7     .  .  .  I didn't know he had a prior felony record.  If, in

8     fact, if I knew that, I would have -- I presume I would have

9     handled it altogether different. [¶] I didn't know he was a

10    Blood.  This is a Blood/Crip situation, I -- I know that I would

11    have attacked him on that ground.

12

13  (R.T. 1731).

14

15    In response, the prosecutor argued that the alleged newly

16  discovered evidence would not have altered the outcome of the trial

17  (R.T. 1732).  The prosecutor continued:

18

19     More importantly, [Petitioner's counsel] had an

20    opportunity prior to Mr. Hardy testifying on the stand to

21    interview Mr. Hardy extensively with his defense

22    investigator.  Now, that was his opportunity to ask him

23    anything he wanted to ask him regarding his background.  It

24    would have been incumbent upon [Petitioner's counsel] to

25    delve into all matters that he thought would have dealt with

26    the defense of his client.

27  ///

28  ///

1    In addition to that, [Petitioner's counsel] never came
2    before the court or asked the court or even asked the
3    district attorney whether he could ask Mr. Hardy on the
4    stand whether he had a criminal record.

5

6    Now these are just basic questions that you would think
7    that would have come up or should have come up if a
8    credibility call of a witness in cross-examination is a
9    question.  That never occurred.  Never happened.  It wasn't
10   like there was a time problem with this witness.  We had
11   difficulties getting the witness on the stand, but he was on
12   the stand for a long time and the court had ordered that the
13   defense have access to these witnesses prior to the witness
14   testifying.  And that occurred, that happened.

15

16   (R.T. 1733).

17

18   The court denied the motion, ruling that, in light of other
19   evidence linking Petitioner to the crimes and the "aggressive cross-
20   examination" of Hardy, the alleged newly discovered evidence did not
21   "reach[] the level that warrants a new trial" (R.T. 1735-36).

22

23         4.    Proceedings in the Court of Appeal

24

25   On December 8, 1999, Petitioner filed a brief in the California
26   Court of Appeal, arguing, inter alia, that the trial court had erred
27   in denying the motion for a new trial and that the prosecution's
28   failure to disclose the evidence about Hardy's prior robbery

18

1  conviction and Blood gang membership violated <u>Brady</u> (Ans., Ex. D,

2  pp. D-147 - D-154).  Petitioner's counsel later filed a motion to

3  augment the record to include: (1) Hardy's declaration, which

4  previously had not been made part of the appellate record; and (2) a

5  declaration of Petitioner's trial counsel stating: (a) prior to trial,

6  the prosecutor did not inform Petitioner's trial counsel that Hardy

7  had a prior felony conviction for robbery, that Hardy was on

8  probation, or that Hardy was a member of the Piru Blood gang; and (b)

9  trial counsel did not learn until after trial that Hardy was on felony

10 probation as a result of a robbery conviction and that in the

11 probation report for that offense Hardy stated he was a "Piru Blood"

12 (Pet., Ex. F, pp. F-7 - F-8).  The Court of Appeal granted the motion

13 to augment the record (<u>see</u> Trav., Ex. K).

14

15      **5.   <u>Opinion of the Court of Appeal</u>**

16

17     The Court of Appeal rejected Petitioner's claims in the following

18 discussion:

19

20          According to the motion for a new trial filed on

21      defendant Amado's behalf, there was newly discovered

22      evidence that Hardy had a prior felony record not disclosed

23      to the defense before or during trial, although this was

24      known to the prosecution.  In addition, Hardy is a member of

25      the Bloods gang, a rival of the Crips, who purportedly did

26      the shooting.  Finally, since the trial, Hardy had been

27      arrested and was awaiting trial for murder.  There are no

28      affidavits attached to the motion.  On the morning of the

                                    19

hearing, however, defendant Amado's counsel produced a hand-

written declaration purportedly by Hardy.  The court

considered the declaration to be part of counsel's moving

papers.


Hardy states in the declaration that he had a prior

felony record *before testifying in the instant case*, in that

he was convicted in 1997 of a robbery for which he currently

is on probation.  He also states that he was affiliated with

the Piru Bloods of Carson at one time, although he currently

had no gang affiliation.


Hardy's declaration establishes what evidence would be

available and its materiality (relevance to impeachment).

It does not establish that the evidence is indeed newly

discovered, however, nor does it establish that defense

counsel could not have discovered the impeaching facts in

the exercise of due diligence.  The record before us does

not establish the prosecution's failure under <u>Brady</u> to

reveal this information to defense counsel.  Accordingly,

defense counsel must demonstrate the newly-discovered nature

of the evidence <u>and</u> an inability to discover and produce the

evidence at trial, with the exercise of due diligence, in

order to be entitled to a new trial.  As noted <u>ante</u>, he must

do this with the best available evidence, in this case,

counsel's declaration.  (<u>People v. Martinez</u>, [36 Cal.3d 816]

at p. 821 [205 Cal. Rptr. 852, 685 P.2d 1203 (1984)].)

While counsel did state at the hearing that he did not

1   discover Hardy's prior felony conviction and former gang
2   affiliation until after the trial, he was making argument,
3   not testifying under oath, when he did so.  His statement
4   therefore is not evidence that the foregoing facts were
5   newly discovered.
6
7        In short, defendant Amado failed to produce <u>any</u>
8   evidence to establish that the impeaching facts about Hardy
9   were newly discovered and could not have been discovered and
10  produced at trial in the exercise of due diligence, let
11  alone the best available evidence.  His failure to do so
12  warranted denial of his motion. (See, e.g., <u>People v.</u>
13  <u>Arguello</u> (1964) 61 Cal.2d 210, 214 [37 Cal. Rptr. 601, 603,
14  390 P.2d 377].)
15
16  (Ans., Ex. A, pp. A-39 - A-40) (original emphasis, internal footnote
17  omitted).
18
19  B.   <u>Discussion</u>
20
21       1.   <u>Introduction</u>
22
23       "The suppression by the prosecution of evidence favorable to an
24  accused . . . violates due process where the evidence is material
25  either to guilt or to punishment, irrespective of the good faith or
26  bad faith of the prosecution." <u>Brady</u> at 87.  Suppressed evidence is
27  material "if there is a reasonable probability that, had the evidence
28  been disclosed to the defense, the result of the proceeding would have

1 | been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995)

2 | (quoting United States v. Bagley, 473 U.S. 667, 682, 685 (1985)).

3 | The Brady rule is "clearly established by controlling Supreme Court

4 | precedent." Benn v. Lambert, 283 F.3d 1040, 1052 (9th Cir.), cert.

5 | denied, 123 S. Ct. 341 (2002).

6 |

7 |       Supreme Court cases following Brady clearly established that

8 |       the defendant must prove three elements in order to show a

9 |       Brady violation.  First, the evidence at issue must be

10 |       favorable to the accused, because it is either exculpatory

11 |       or impeachment material.  [citation].  Second, the evidence

12 |       must have been suppressed by the State, either willfully or

13 |       inadvertently.  [citation].  Third, prejudice must result

14 |       from the failure to disclose the evidence.  [citation].

15 |

16 | Benn v. Lambert, 283 F.3d at 1052-53.

17 |

18 |       The duty to disclose evidence "favorable" to the defense includes

19 | the duty to disclose impeachment evidence material to the credibility

20 | of a prosecution witness.  See Strickler v. Greene, 527 U.S. 263, 280

21 | (1999); Benn v. Lambert, 283 F.3d at 1052; Carriger v. Stewart, 132

22 | F.3d 463, 479 (9th Cir. 1997), cert. denied, 523 U.S. 1133 (1998).

23 | Respondent does not contest Petitioner's assertion that the alleged

24 | Brady evidence would have been "favorable" to Petitioner's defense.

25 | Rather, Respondent argues: (1) the evidence was not "suppressed" by

26 | the prosecution because Petitioner's counsel allegedly failed to

27 | exercise due diligence to obtain the evidence in time for its

28 | effective use at trial; and (2) the allegedly suppressed evidence was

1  not material under <u>Brady</u>.  Respondent also asserts Petitioner's <u>Brady</u>
2  claim is procedurally barred by the Court of Appeal's determination
3  that Petitioner failed to make a sufficient record showing the
4  evidence was newly discovered and could not have been discovered by
5  the defense in the exercise of due diligence.

6

7          **2.   <u>The Court of Appeal's Determination that Petitioner</u>**
8               **<u>Failed to Make a Sufficient Record Showing that the Evidence</u>**
9               **<u>Was Newly Discovered and Could Not Have Been Discovered by</u>**
10              **<u>the Defense in the Exercise of Due Diligence Does Not</u>**
11              **<u>Preclude Habeas Review</u>.**

12

13     The Court of Appeal observed that Hardy's declaration, by itself,
14  did not establish that the allegedly suppressed evidence was "newly
15  discovered" or that defense counsel could not have "discovered the
16  impeaching facts in the exercise of due diligence" (see Ans., Ex. A,
17  p. A-39).  The remainder of the Court of Appeal's discussion appears
18  to concern not the <u>Brady</u> issue <u>per se</u> but rather the issue of whether
19  Petitioner complied with the state law rules governing new trial
20  motions.  In particular, the Court of Appeal cited <u>People v. Martinez</u>,
21  36 Cal. 3d 816, 205 Cal. Rptr. 852, 685 P.2d 1203 (1984) for the
22  proposition that the trial court properly denied the motion for a new
23  trial because defense counsel failed to submit (to the trial court) a
24  sworn declaration showing defense counsel's inability to discover and
25  produce the evidence at trial in the exercise of due diligence (<u>see</u>
26  Ans., Ex. A, at p. A-40).
27  ///
28  ///

1    It is unclear whether the Court of Appeal relied upon defense

2    counsel's failure to submit a "due diligence" declaration in rejecting

3    Petitioner's Brady claim (as distinguished from Petitioner's state law

4    claim).  Respondent argues the Court of Appeal did reject Petitioner's

5    Brady claim because of Petitioner's counsel's failure to supply a

6    "declaration or testimony under oath attesting to the fact that

7    Petitioner's trial counsel did not have this information prior to

8    trial" (Ans., p. 9).  Even assuming the accuracy of Respondent's

9    interpretation of the Court of Appeal opinion, the assertedly

10   procedural rejection of Petitioner's Brady claim would not preclude

11   this Court's habeas review of the merits of that claim.

12

13   In People v. Martinez, supra, the California Supreme Court

14   reviewed a trial court's denial of a motion for a new trial on the

15   ground of newly discovered evidence.  The Martinez Court applied the

16   state law standard for new trial motions, which requires a showing,

17   inter alia, that the moving party could not have discovered and

18   produced the new evidence at trial in the exercise of reasonable

19   diligence, by the "best evidence of which the case admits."  Id. at

20   821, 205 Cal. Rptr. at 854, 685 P.2d at 1205 (citations and internal

21   quotations omitted).  However, the Martinez Court also indicated "the

22   standard of diligence may be relaxed when the newly discovered

23   evidence would probably lead to a different result on retrial."  Id.

24   at 825, 205 Cal. Rptr. at 857, 685 P.2d at 1208 (citations and

25   footnote omitted).  "Once a trial court determines that a defendant

26   did not have a fair trial on the merits, and that by reason of the

27   newly discovered evidence the result could reasonably and probably be

28   different on a retrial [citation], it should not seek to sustain an

erroneous judgment imposing criminal penalties on the defendant as a way of punishing defense counsel's lack of diligence." Id. at 826, 205 Cal. Rptr. at 857 (internal quotations and footnote omitted). This principle mandates application of the "reasonable probability of a different outcome" standard, which is also the standard for Brady materiality. See Kyles v. Whitley, 514 U.S. at 433.

In the present case, although the Court of Appeal appeared to think the evidence was material, the Court of Appeal nevertheless ruled defense counsel's supposed lack of diligence justified denial of the new trial motion on state law grounds, and (according to Respondent) also denied the Brady claim on these grounds. However, under the standard set forth in People v. Martinez, which the Court of Appeal purported to apply, if the Brady evidence was material, the Court of Appeal properly could not reject the claim for failure to make a showing of diligence.

Moreover, the Court of Appeal's determination that the record failed to show defense counsel did not discover the evidence prior to the conclusion of the trial was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(2). The Court of Appeal had granted Petitioner's motion to augment the record. Therefore, the record before the Court of Appeal did contain a sworn, uncontroverted statement by counsel attesting to counsel's lack of knowledge. Furthermore, and in any event, at the hearing on the motion in the trial court, Petitioner's counsel represented in open court that he did not have the impeachment evidence prior to the conclusion of

1 | trial.  Such a representation by an officer of the court is
2 | "tantamount to sworn testimony."  See People v. Laudermilk, 67 Cal. 2d
3 | 272, 286, 61 Cal. Rptr. 644, 654, 431 P.2d 228, 238 (1967); People v.
4 | Wolozon, 138 Cal. App. 3d 456, 460 n.4, 188 Cal. Rptr. 35, 37 n.4
5 | (1982); see also Holloway v. Arkansas, 435 U.S. 475, 485-86 (1978)
6 | (when defense attorneys declare a conflict of interest in open court,
7 | "their declarations are virtually made under oath"); Aceves v.
8 | Superior Court, 51 Cal. App. 4th 584, 594, 59 Cal. Rptr. 2d 280, 285
9 | (1996) (same; quoting Holloway v. Arkansas, supra).

11 |     Therefore, to the extent the Court of Appeal rejected
12 | Petitioner's Brady claim for procedural reasons, the Court of Appeal
13 | manifestly erred.  At the very least, no clear or consistently applied
14 | state procedural rule justified barring Petitioner's Brady claim under
15 | the circumstances of his direct appeal.  See Wood v. Hall, 130 F.3d
16 | 373, 376 (9th Cir. 1997), cert. denied, 523 U.S. 1129 (1998) ("in
17 | order to constitute adequate and independent grounds sufficient to
18 | support a finding of procedural default, a state rule must be clear,
19 | consistently applied, and well-established at the time of the
20 | petitioner's purported default") (citations and quotations omitted).
21 | Hence, any alleged procedural default based upon the asserted
22 | deficiencies in the record does not bar this Court's review of
23 | Petitioner's Brady claim.  Id.; see Martinez v. Klauser, 266 F.3d
24 | 1091, 1093-94 (9th Cir. 2001) (no procedural default where state court
25 | applied a state rule unsupported by prior state law authority and cast
26 | into doubt by subsequent state court decisions).
27 | ///
28 | ///

3.  **The Prosecution Suppressed the Brady Evidence**.

To show a Brady violation, Petitioner must show that evidence favorable to Petitioner was "suppressed by the State." Strickler v. Greene, 527 U.S. at 281-82; Carriger v. Stewart, 132 F.3d at 479-80. "Evidence is suppressed for Brady purposes only if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." Boss v. Pierce, 263 F.3d 734, 740 (7th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 1078 (2002); see also United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (no suppression where defendant has enough information to obtain the Brady material on his own; citations omitted); United States v. Dupuy, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) ("Since suppression by the Government is a necessary element of a Brady claim [citation], if the means of obtaining the exculpatory evidence has [sic] been provided to the defense, the Brady claim fails. [citations]."). Petitioner need not show the defense requested the Brady information, for the prosecution's duty to disclose Brady evidence "is applicable even though there has been no request by the accused." See Strickler v. Greene, 527 U.S. at 280 (citation omitted).

At the hearing on the motion for a new trial, the prosecutor did not contend the state lacked possession of the Brady material. Similarly, in the present proceeding, Respondent does not dispute that the Brady material was "possessed by the State" at the time of

1  Petitioner's trial.  See Kyles v. Whitley, 514 U.S. at 437 ("the

2  individual prosecutor has a duty to learn of any favorable evidence

3  known to the others acting on the government's behalf in the case,

4  including the police"); Benn v. Lambert, 283 F.3d at 1053 ("the

5  disclosure requirements set forth in Brady apply to a prosecutor even

6  when the knowledge of the exculpatory evidence is in the hands of

7  another prosecutor," citing Giglio v. United States, 405 U.S. 150, 154

8  (1972)).  The particular individual who prosecuted Petitioner may not

9  have had actual knowledge of the Brady material at the time of trial.

10 At the hearing on the motion for a new trial, the prosecutor remained

11 silent when Petitioner's counsel, and the trial court, stated the

12 prosecutor had not known about Hardy's prior robbery conviction or

13 probation status at the time Hardy testified (see R.T. 1729-30).

14 However, the state cannot avoid its Brady obligations through reliance

15 on the possible ignorance of the individual prosecutor.  See Strickler

16 v. Greene, 527 U.S. at 280-81; Kyles v. Whitley, 514 U.S. at 438-39.

17 Brady imposes upon the prosecutor the affirmative obligation to learn

18 of any exculpatory information known to others acting on the state's

19 behalf.  See Carriger v. Stewart, 132 F.3d at 479-80.  "Because the

20 prosecution is in a unique position to obtain information known to

21 other agents of the government, it may not be excused from disclosing

22 what it does not know but could have learned."  Id. at 480 (citation

23 omitted).  This includes available information on the criminal history

24 of a prosecution witness.  Id.; see Briggs v. Raines, 652 F.2d 862,

25 865 (9th Cir. 1981) (failure to disclose material information

26 favorable to defense contained in homicide victim's FBI rap sheet

27 could violate Brady); see also United States v. Perdomo, 929 F.2d 967,

28 970-71 (3d Cir. 1991); United States v. Auten, 632 F.2d 478, 481 (5th

1   Cir. 1980).  Information concerning witnesses' criminal histories and

2   gang affiliations was available to the prosecutor.  For example, in

3   pretrial proceedings, the prosecutor offered to run a "rap sheet" on a

4   potential witness and to investigate the witness' gang affiliation on

5   a "gang computer."

6

7        Respondent contends that, during the new trial proceedings,

8   Petitioner failed to produce a declaration or sworn testimony showing

9   the defense could not have obtained the Brady material prior to trial

10  in the exercise of due diligence (Ans., p. 9).  As previously

11  discussed, this Court rejects the argument that any alleged procedural

12  default bars this Court's consideration of Petitioner's Brady claim.

13  However, Respondent also cites United States v. Bracy, 67 F.3d 1421

14  (9th Cir. 1995), which provides that no Brady violation occurs where

15  the defendant has "all the information necessary . . . to discover the

16  alleged Brady material" on his or her own.  Id. at 1428-29.  Although

17  Respondent's argument is somewhat unclear, this citation suggests

18  Respondent argues Petitioner's Brady claim fails because Petitioner's

19  counsel allegedly could have discovered the impeaching information

20  about Hardy in the exercise of reasonable diligence.

21

22        In United States v. Bracy, the defendant asserted the government

23  suppressed evidence about a key witness' criminal activity and

24  subsequent cooperation with authorities.  Id. at 1428.  In Bracy, the

25  government had provided the defense with a National Crime Information

26  Center computer printout and two other reports detailing the witness'

27  criminal history.  Id. at 1428.  The prosecution in Bracy thereby

28  provided the defense with information enabling the defense to discover

1  the impeaching information.  Id.  Here, by contrast, Respondent does

2  not contend, and the record does not show, that prior to or during

3  trial Petitioner's counsel possessed any facts indicating Hardy might

4  have a criminal record or affiliation with a gang.  The mere knowledge

5  that Hardy was an inculpatory prosecution witness would not suggest to

6  the defense the existence of the undisclosed impeachment evidence.

7  Cf. Benn v. Lambert, 283 F.3d at 1061-62 (noting that dicta contained

8  in prior case law, to the effect that no Brady suppression occurs

9  where the defense can ascertain the undisclosed information itself, is

10  "overbroad, at the very least").

11

12     Moreover, in deciding not to inquire further, Petitioner's

13  counsel reasonably could have relied upon the prosecution's reportedly

14  "complete" discovery production.  In Strickler v. Greene, the state

15  contended the petitioner had defaulted his Brady claim by failing to

16  raise it at trial.  The Supreme Court rejected this contention, ruling

17  the prosecution's "open file" discovery practice had impeded trial

18  counsel's access to the factual basis for the Brady claim, and hence

19  constituted cause for the default.  Strickler v. Greene, 527 U.S. at

20  283.  In particular, the Supreme Court observed that "if a prosecutor

21  asserts that he complies with Brady through an open file policy,

22  defense counsel may reasonably rely on that file to contain all

23  materials the State is constitutionally obligated to disclose under

24  Brady."  Id. at 283 n.23.

25

26     In the present case, early in the pretrial proceedings, the

27  prosecution purportedly provided the defense with the "murder book"

28  and the "entire discovery package" (except for addresses and telephone

numbers regarding certain witnesses who were the subject of the
court's protective order).  Under California law, the prosecution was
<u>required</u> to disclose "[t]he existence of a felony conviction of any
material witness whose credibility is likely to be critical to the
outcome of the trial," as well as "[a]ny exculpatory evidence"  <u>See</u>
Cal. Penal Code §§ 1054.1(d), (e).  Petitioner's counsel reasonably
could have assumed that the production of the supposedly "complete"
discovery package included information about the criminal records and
gang affiliations, if any, of all key prosecution witnesses, including
Hardy.

The record does not show the defense had available to it any
information about Hardy's criminal history, probationary status or
gang affiliation.  California Penal Code section 11105(b)(8) provides
that the California Attorney General "shall furnish state summary
criminal history information" to a "public defender or attorney of
record when representing a person in a criminal case and if authorized
access by statutory or decisional law."  This "state summary criminal
history information" is "commonly known as a 'rap sheet.'"  <u>McCall v.
Oroville Mercury Co., Inc.</u>, 142 Cal. App. 3d 805, 808, 191 Cal. Rptr.
280, 282 (1983).  However, at least at the time of Petitioner's trial,
it was "the policy of the Department of Justice to release rap sheets
only to prosecutors, . . . and defense disclosure requests must go
through the prosecutor's office."  <u>People v. Little</u>, 59 Cal. App. 4th
426, 432, 68 Cal. Rptr. 2d 907, 911 (1997).  "Not only does the
prosecutor have reasonable access to rap sheets, <u>he is the assigned
doorkeeper</u>."  <u>Id.</u> at 432-33, 68 Cal. Rptr. 2d at 911 (emphasis added;
holding prosecution had state law duty to disclose felony convictions

1  of all material witnesses, and noting <u>Brady</u> "requires the same

2  result"). But, under <u>Brady</u>, the prosecutor's obligation to disclose

3  material impeachment evidence existed <u>irrespective of any defense</u>

4  <u>request therefor</u>. Respondent fails to explain how Petitioner's

5  counsel could have discovered Hardy's criminal record prior to trial,

6  without even an address, and in light of Hardy's use of the name

7  "Collins" during the police interviews. See <u>Crivens v. Roth</u>, 172 F.3d

8  991, 997 (7th Cir. 1999) ("Criminals often use aliases, but the police

9  are able to link the various names to a single individual through a

10  variety of means.").

11

12     Similarly, the defense had no direct access to information about

13  Hardy's gang status and, because of the represented completeness of

14  the prosecution's "discovery package," no reason to believe any such

15  information existed.  To inspect Hardy's probation report, the defense

16  would have had to obtain a court order.  See Cal. Penal Code §

17  1203.05(b).  The defense had no reason to seek such an order, absent

18  knowledge of Hardy's criminal record.  Sec <u>In re Pratt</u>, 69 Cal. App.

19  4th 1294, 1318, 82 Cal. Rptr. 2d 260, 275 (1999) ("we find no basis in

20  law or logic to support the notion that Pratt was required to attempt

21  to show good cause to inspect an otherwise confidential [probation

22  report of a prosecution witness] when he had no idea what the document

23  contained").  Respondent does not contend, and the record does not

24  show, that the defense had access to the police "gang computer"

25  database utilized by the prosecution.

26

27     At the hearing on the motion for a new trial, the prosecutor

28  argued Petitioner's counsel could have interviewed Hardy during or

32

1 | after voir dire, or during a break in testimony, or could have asked

2 | Hardy on cross-examination about a possible criminal record (see R.T.

3 | 1733). Respondent does not make this argument in the present

4 | proceedings. In any event, the prosecution must disclose Brady

5 | material "at a time when the disclosure remains of value." United

6 | States v. Vgeri, 51 F.3d 876, 880 (9th Cir. 1995) (citing United

7 | States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) for the

8 | quoted rule); United States v. Aichele, 941 F.2d 761, 764 (9th Cir.

9 | 1991)(disclosure of impeachment information, including witness' rap

10 | sheet, during trial but prior to three week holiday break did not

11 | violate Brady); see also Leka v. Portuondo, 257 F.3d 89, 100-03 (2d

12 | Cir. 2001) (prosecution's "last-minute" identifications of names and

13 | addresses of witnesses potentially favorable to the defense violated

14 | Brady; limited disclosure "could have led to specific exculpatory

15 | information only if the defense undertook further investigation," and

16 | defense had insufficient opportunity to investigate witnesses and

17 | assimilate the information into the defense trial strategy). Further,

18 | it would be somewhat speculative to suggest that, had Petitioner's

19 | counsel asked Hardy about his criminal record or gang affiliation,

20 | Hardy voluntarily would have provided complete and truthful

21 | information. Hardy's use of multiple names, as well as his dubious

22 | claim he could not recall events that he so clearly had described to

23 | police, suggest Hardy was not above dissembling. See Crivens v. Roth,

24 | 172 F.3d at 997 ("we find it entirely possible that [witness] would

25 | not have told the complete truth if asked about his criminal history

26 | based on the fact that he had previously lied to police officers and

27 | the courts as evidenced by his use of aliases.").

28 | ///

1    Additionally, the prosecutor's suggestion that Petitioner's

2  counsel could have fished for felony records during the cross-

3  examination of Hardy was completely untenable.  It would have been

4  improper for Petitioner's counsel to ask Hardy if Hardy had suffered a

5  felony conviction unless counsel had a "good faith" belief to support

6  the question and was prepared to provide "documentary evidence that

7  the witness [had] suffered a prior conviction in the event he denie[d]

8  it."  See People v. Conover, 243 Cal. App. 2d 38, 52, 52 Cal. Rptr.

9  172, 182 (1966); see also People v. Williams, 228 Cal. App. 3d 146,

10  152, 278 Cal. Rptr. 801, 804 (1991) ("A proper basis for establishing

11  good-faith [to use a prior conviction as impeachment] is a witness'

12  rap sheet. [citation].").  Because of the prosecution's suppression,

13  Petitioner's counsel did not have any such "good faith belief" or

14  "documentary evidence" during trial.

15

16    In sum, the record reflects that the prosecution suppressed

17  potential impeachment evidence regarding key prosecution witness

18  Warren Hardy.  To the extent the California state courts ruled to the

19  contrary, such ruling constituted an objectively unreasonable

20  application of Brady.

21

22    4.    The Brady Evidence Was Material.

23

24    Suppressed evidence is material "if there is a reasonable

25  probability that, had the evidence been disclosed to the defense, the

26  result of the proceeding would have been different."  Kyles v.

27  Whitley, 514 U.S. at 433.  "A 'reasonable probability' of a different

28  result is . . . shown when the government's evidentiary suppression

1   'undermines confidence in the outcome of the trial.'"  Kyles v.

2   Whitley, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S.

3   667, 678 (1985)); see Strickler v. Greene, 527 U.S. at 290 ("[T]he

4   question is whether the favorable evidence could reasonably be taken

5   to put the whole case in such a different light as to undermine

6   confidence in the [outcome]" (citation and quotations omitted).  "The

7   question is not whether the defendant would more likely than not have

8   received a different verdict with the evidence, but whether in its

9   absence he received a fair trial, understood as a trial resulting in a

10  verdict worthy of confidence."  Kyles v. Whitley, 514 U.S. at 434.

11

12      In determining whether the suppressed evidence was material, the

13  court must examine the totality of the undisclosed evidence in "the

14  context of the entire record."  Benn v. Lambert, 283 F.3d at 1058

15  (citations, footnote and internal quotations omitted).  The

16  materiality of the suppressed evidence must be determined

17  "collectively, not item by item."  Kyles v. Whitley, 514 U.S. at 436

18  (footnote omitted).

19

20      "[S]uppression of material impeachment evidence, particularly for

21  key state witnesses, may require the reversal of a conviction . . . ."

22  Silva v. Woodford, 279 F.3d 825, 854-55 (9th Cir.), cert. denied, 123

23  S. Ct. 342 (2002) (district court abused its discretion in denying

24  evidentiary hearing, under pre-AEDPA standards, on Brady claim in

25  capital murder case, where prosecution allegedly withheld evidence

26  showing prosecution doubted mental competency of key prosecution

27  witness, who was the only witness who could identify petitioner as the

28  "trigger man"); United States v. Steinberg, 99 F.3d 1486, 1492 (9th

1  Cir. 1996) ("Informant Schultz was the Government's key witness in the

2  trial.  Thus, his credibility was an important issue in the case.

3  Evidence that he was engaged in ongoing criminal activity and owed the

4  defendant money was relevant to his credibility, and the defendant was

5  entitled to have the jury know about it. [citation]."; reversing

6  conviction because of _Brady_ violation), _disapproved on other grounds_,

7  _United States v. Foster_, 165 F.3d 689, 692 n.5 (9th Cir. 1999).

8

9       The credibility of Hardy's statements was key to the

10  prosecution's case against Petitioner.  Other witnesses corroborated

11  some of Hardy's statements concerning Petitioner, but the most

12  significant aspects of Hardy's inculpatory evidence depended solely on

13  Hardy's credibility.  In particular, Hardy's statements that

14  Petitioner carried a gun as Petitioner approached the bus were

15  uncorroborated by any other evidence (_see_ Ans., p. 10).  Also, Hardy

16  was the only witness who said Petitioner laughed and "bragged" about

17  the shooting the following day.

18

19       Hardy's uncorroborated statements were extremely significant to

20  the prosecution's case against Petitioner.  Without these statements,

21  the prosecution's case against Petitioner essentially would have

22  consisted of evidence that Petitioner was with the group that advanced

23  toward the bus, that Petitioner was near the back of the bus at the

24  time of the shooting, and that Petitioner ran in the same direction as

25  others after the shooting.  Limited to this evidence, a jury well may

26  have been unable to find Petitioner harbored the requisite intent for

27  _first degree murder_.  Hardy's evidence that Petitioner himself had a

28  gun during the attack, however, significantly supported the

1  prosecution's theory that Petitioner possessed the requisite intent.

2  This evidence enabled the prosecutor to argue, in closing, that there

3  was "no reason" for Petitioner and Johnson to "bring a gun into the

4  mix" unless their purpose was "not to bluff" (R.T. 1592-93).  No less

5  than ten separate times during jury argument the prosecutor stressed

6  Hardy's evidence that Petitioner had carried a gun during the attack

7  (R.T. 1518, 1523, 1585, 1587, 1592-93, 1595).  Hardy's evidence that

8  Petitioner laughed and bragged about the shooting also supported the

9  theory that Petitioner had been part of an orchestrated plan to use

10  deadly force.  This evidence tended to refute any suggestion

11  Petitioner had not intended the tragic results of the previous day.

12

13     Respondent argues: (1) the prosecutor brought out Hardy's

14  reluctance to testify and Hardy's use of a different name ("Collins");

15  (2) at trial Hardy said he could not remember how he described the

16  person he saw with the gun, refused to identify anyone, and denied

17  ever identifying Petitioner; and (3) Hardy underwent extensive cross-

18  examination during which Hardy said he was "farsighted" (Ans., p. 11).

19  Respondent's arguments attempt to support the trial court's opinion

20  that the suppressed impeachment evidence was immaterial (R.T. 1735-

21  36).[6]

22  ///

23  ///

24

25     [6]    Petitioner argues the AEPDA requires this Court to
   defer to the Court of Appeal's alleged determination that the
26  Brady evidence was material.  In light of this Court's conclusion
   that: (1) the Brady evidence was material; and (2) the trial
27  court's contrary conclusion was objectively unreasonable, the
   Court need not determine whether the Court of Appeal's alleged
28  materiality determination merits deference.

The trial court's opinion that the suppressed impeachment
evidence was immaterial, an opinion unshared by the Court of Appeal,
was objectively unreasonable.  The suppressed evidence would have
generated impeachment qualitatively different from the impeachment
that actually occurred.  The suppressed evidence, unlike the
impeachment evidence available at trial, would have provided
significant proof of Hardy's bias and motivation to lie.
The defense could have used evidence that Hardy was on probation at
the time he testified to suggest Hardy was motivated falsely to
implicate Petitioner to curry favor with authorities.  See People v.
Adams, 149 Cal. App. 3d 1190, 1193, 197 Cal. Rptr. 623, 625 (1983)
(error to exclude evidence of witness' status as a probationer, which
was "relevant to impeach his testimony for bias, prejudice and his
possible motive to cooperative with authorities"); People v. Espinoza,
73 Cal. App. 3d 287, 291, 140 Cal. Rptr. 846, 848 (1977) ("a witness'
probationary status may be used to show his potential bias or
prejudice based on concern of jeopardy to his probation"); see also
Davis v. Alaska, 415 U.S. 308, 317-18 (1974) (trial court's refusal to
allow defense counsel to cross-examine key prosecution witness
regarding witness' probationary status violated defendant's
constitutional right of confrontation).  The defense could have used
evidence that Hardy was a member of a Blood gang to suggest Hardy's
bias against, and motivation falsely to implicate, an associate of a
rival gang.  See In re Wing Y., 67 Cal. App. 3d 69, 76-77, 136 Cal.
Rptr. 390, 394 (1977) (evidence that witness is member of same gang as
defendant can be used to show bias); see also United States v. Abel,
469 U.S. 45, 49 (1984) (witness' gang membership admissible to show
bias in favor of defendant); Clark v. O'Leary, 852 F.2d 999, 1005-08

1  (7th Cir. 1988) (exclusion of impeachment evidence showing key

2  prosecution witnesses were rival gang members violated the

3  Confrontation Clause of the Sixth Amendment; error not harmless).

4  The defense also could have used to significant effect evidence that

5  Hardy had a prior felony conviction involving moral turpitude.  See

6  People v. Castro, 38 Cal. 3d 301, 316, 211 Cal. Rptr. 719, 728, 696

7  P.2d 111, 120 (1985) (defendant may be impeached by evidence of a

8  prior felony conviction involving moral turpitude); see also People v.

9  Wheeler, 4 Cal. 4th 284, 295-96, 14 Cal. Rptr. 2d 418, 425, 841 P.2d

10  938, 945 (1992) ("[m]isconduct involving moral turpitude may suggest a

11  willingness to lie"; citations omitted).

12

13      The impeachment evidence available at trial was more limited, and

14  more easily explained, than the suppressed impeachment evidence.  In

15  jury argument, the prosecutor explained much of the defense's

16  impeachment of Hardy as having been the product of Hardy's supposed

17  fear and reluctance to testify (R.T. 1534-36, 1587-88).  Needless to

18  say, the prosecutor could not have explained Hardy's undisclosed

19  biases and felony conviction in this fashion.  Furthermore, in arguing

20  that Hardy's statements to police were more truthful than his

21  inconsistent trial testimony, the prosecutor invited the jurors to ask

22  themselves "Well, what does this person have to gain by telling the

23  police what [he] told them in the first place?" (R.T. 1535).  From the

24  evidence at trial, the jurors well might have answered this question

25  "Nothing," and then believed Hardy's apparently unbiased statements to

26  police.  Had the jurors known about the suppressed impeachment

27  evidence, however, the jurors well might have answered this question

28  quite differently.  And, in all probability, it would have been

1 │ Petitioner's counsel, not the prosecutor, who would have been inviting

2 │ the jurors to ask themselves the question.

3 │

4 │     Thus, the undisclosed <u>Brady</u> evidence was "substantial and was far

5 │ more damaging to [Hardy's] credibility than the impeachment evidence

6 │ available to the defense at trial." <u>See</u> <u>Benn v. Lambert</u>, 283 F.3d at

7 │ 1055.  Where "there is reason to believe that the jury relied on a

8 │ witness's testimony to reach its verdict despite the introduction of

9 │ impeachment evidence at trial, and there is a reasonable probability

10 │ that the suppressed impeachment evidence, when considered together

11 │ with the disclosed impeachment evidence, would have affected the

12 │ jury's assessment of the witness's credibility, the suppressed

13 │ impeachment evidence is prejudicial." <u>Id.</u> at 1056.  There exists a

14 │ "reasonable probability": (1) the jury relied upon Hardy's statements

15 │ in reaching its verdict; (2) the undisclosed impeachment evidence

16 │ would have affected the jury's assessment of Hardy's credibility and

17 │ led the jury to reach a different result.  <u>See</u> <u>Strickler v. Greene</u>,

18 │ 527 U.S. at 300-301 (explaining "reasonable probability").[7]  The

19 │ absence of the undisclosed impeachment evidence thus deprived

20 │ Petitioner of "a fair trial, understood as a trial resulting in a

21 │ verdict worthy of confidence." <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. at 434.

22 │ ///

23 │

24 │ _____

25 │     [7]   "[A] reasonable probability that, had the evidence been
   │ disclosed to the defense, the result of the proceeding would have
   │ been different, necessarily entails the conclusion that the
26 │ suppression must have had substantial and injurious effect or
   │ influence in determining the jury's verdict." <u>Kyles v. Whitley</u>,
27 │ 514 U.S. at 435 (citations and quotations omitted).  Hence, there
   │ is no need for further "harmless error review" under <u>Brecht v.</u>
28 │ <u>Abrahamson</u>, 507 U.S. 619 (1993).  <u>Id.</u>

1      5.   **Conclusion**

2

3         The above discussion demonstrates: (1) the prosecution suppressed

4   material exculpatory evidence in violation of the "clearly

5   established" rule of Brady; and (2) in failing to grant Petitioner

6   post-conviction relief, the state courts applied Brady in an

7   objectively unreasonable manner.  Therefore, Petitioner is entitled to

8   habeas relief.

9

10  III. **Petitioner's Challenge to the Sufficiency of the Evidence Does**

11       **Not Merit Habeas Relief.**

12

13        Although the Brady violation warrants habeas relief, the Court

14  nevertheless must evaluate the sufficiency of the trial evidence, "as

15  the Double Jeopardy Clause would preclude retrial if the evidence were

16  insufficient."  See Bean v. Calderon, 163 F.3d 1073, 1086 (9th Cir.

17  1998), cert. denied, 528 U.S. 922 (1999) (citation omitted).[8]

18

19  A.    **Standards Governing Sufficiency of the Evidence**

20

21        On habeas corpus, the Court's inquiry into the sufficiency of

22  evidence is limited.  Evidence is sufficient unless the charge was "so

23  totally devoid of evidentiary support as to render [Petitioner's]

24  conviction unconstitutional under the Due Process Clause of the

25  Fourteenth Amendment."  Fish v. Cardwell, 523 F.2d 976, 978 (9th Cir.

26  1975), cert. denied, 423 U.S. 1062 (1976) (citations and quotations

27  _____

28        [8]    The Court need not, and does not, address the merits of
    Petitioner's other claims.

1  omitted).  The evidence is to be considered "in the light most

2  favorable to the prosecution." Wright v. West, 505 U.S. 277, 284

3  (1992)(plurality opinion) (citing Jackson v. Virginia, 443 U.S. 307,

4  319 (1979)); see also McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.),

5  cert. denied, 513 U.S. 860 (1994).  A conviction cannot be disturbed

6  unless the Court determines that no "rational trier of fact could have

7  found the essential elements of the crime beyond a reasonable doubt."

8  Wright v. West, 505 U.S. at 284; Jackson v. Virginia, 443 U.S. at 319.

9  The Court "must respect the province of the jury to determine the

10  credibility of witnesses, resolve evidentiary conflicts, and draw

11  reasonable inferences from proven facts by assuming that the jury

12  resolved all conflicts in a manner that supports the verdict." Jones

13  v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997) (citation and quotations

14  omitted).  This Court may grant habeas relief only if the state

15  court's rejection of Petitioner's claim was "objectively

16  unreasonable." See Woodford v. Visciotti, 123 S. Ct. at 361; 28

17  U.S.C. § 2254(d).  In evaluating the sufficiency of the evidence for

18  Double Jeopardy purposes, the reviewing court must consider all of the

19  trial evidence, even evidence improperly admitted. Lockhart v.

20  Nelson, 488 U.S. 33, 40-41 (1988).

21

22  **B.   Discussion**

23

24  Petitioner was convicted on the theory he aided and abetted the

25  charged crimes.  Under California law, "an aider and abettor is a

26  person who, acting with (1) knowledge of the unlawful purpose of the

27  perpetrator, and (2) the intent or purpose of committing, encouraging,

28  or facilitating the commission of the offense, (3) by act or advice

42

aids, promotes, encourages or instigates, the commission of the crime." People v. Prettyman, 14 Cal. 4th 248, 259, 58 Cal. Rptr. 2d 827, 832-33, 926 P.2d 1013, 1018-19 (1996) (citation and internal quotations omitted); see also People v. Beeman, 35 Cal. 3d 547, 560, 199 Cal. Rptr. 60, 68, 674 P.2d 1318, 1325 (1984). "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'" People v. Prettyman, 14 Cal. 4th at 259, 58 Cal. Rptr. 2d at 832 (citation omitted). "Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense." People v. Morante, 20 Cal. 4th 403, 433, 84 Cal. Rptr. 2d 665, 685, 975 P.2d 1071, 1091 (1999) (citations and footnote omitted).

An aider and abettor's criminal liability is "of two kinds." People v. McCoy, 25 Cal. 4th 1111, 1117, 108 Cal. Rptr. 2d 188, 192, 24 P.3d 1210 (2001).

> First, an aider and abettor with the necessary mental state
> is guilty of the intended crime. Second, under the natural
> and probable consequences doctrine, an aider and abettor is
> guilty not only of the intended crime, but also [of] any
> other offense that was the natural and probable consequence
> of the crime aided and abetted. [citation]. Thus, for
> example, if a person aids and abets only an intended
> assault, but a murder results, that person may be guilty of

43

that murder, even if unintended, if it is a natural and
probable consequence of the intended assault. [citation].

Id.

Under the "natural and probable consequences doctrine," an aider
and abettor:

"is guilty not only of the offense he intended to facilitate
or encourage, but also of any reasonably foreseeable offense
committed by the person he aids and abets . . . . [¶] It
follows that a defendant whose liability is predicated on
his status as an aider and abettor need not have intended to
encourage or facilitate the particular offense ultimately
committed by the perpetrator.  His knowledge that an act
which is criminal was intended, and his action taken with
the intent that the act be encouraged or facilitated, are
sufficient to impose liability on him for any reasonably
foreseeable offense  committed as a consequence by the
perpetrator. . . ."  [A] defendant may be held criminally
responsible as an accomplice not only for the crime he or
she intended to aid and abet (the target crime), but also
for any other crime that is the 'natural and probable
consequence' of the target crime.

People v. Prettyman, 14 Cal. 4th at 261, 58 Cal. Rptr. at 834,
(quoting People v. Croy, 41 Cal. 3d 1, 12 n.5, 221 Cal. Rptr. 592,
597, 710 P.2d 392 (1985).

44

In Petitioner's case, the trial court instructed the jury on the elements of aiding and abetting, and gave instructions on the "natural and probable consequences" doctrine (R.T. 1477-82).[9] The court identified the "target crimes" as the crimes of assault with a firearm and assault (R.T. 1481). As previously indicated, the jury found Petitioner guilty of first degree murder, attempted murder, assault with a firearm, and shooting into an occupied vehicle.

Petitioner challenges the sufficiency of the evidence supporting all of his convictions, arguing the evidence was insufficient to show accomplice liability (see Pet. Mem., p. 29). Petitioner concedes there was evidence that Petitioner was "part of the group at the bus stop" and "was seen by Collins [Hardy] carrying a black handled gun in his pocket as he walked to the bus stop at a fast pace" (Pet. Mem., p. 24). Petitioner also concedes there was evidence that Petitioner "was seen near the back of the bus," and "left the scene with the same group of youths who approached [the bus] after Johnson fired the shots into the bus that killed Corie Williams and wounded Tammy Freeman" (Pet. Mem., pp. 24-25). Petitioner concedes there was evidence that Petitioner bore the "gang moniker of 'Bang,'" and "was with a group that talked about the shooting" the next day (Pet. Mem., pp. 25, 30). Nevertheless, Petitioner claims this evidence was insufficient to show Petitioner shared the intent of Pugh and Johnson to shoot someone on the bus, because the evidence assertedly supported the "[e]qually plausible" conclusion that Petitioner, allegedly not a gang member,

---

[9]     With the parties' concurrence, the court did not instruct the jury it could find Petitioner guilty of the crime of attempted murder on a "natural and probable consequences" theory of aiding and abetting (see R.T. 1432-33).

1 | "knew that his brother was with the group going to the bus, . . . got
2 | a gun because he knew there would be trouble, and . . . went there to
3 | protect [Petitioner's brother]" (Pet. Mem., pp. 24, 28-29).
4
5 |     The Court of Appeal rejected Petitioner's challenge to the
6 | sufficiency of the evidence, ruling the evidence showed Petitioner
7 | "intended to aid, promote and encourage an armed attack on Bloods who
8 | were riding the bus" (Ans., Ex. A, p. A-43).  The Court of Appeal
9 | pointed to evidence showing that Petitioner was armed when he
10 | approached the bus, and that at least one other person in the group
11 | was armed:
12
13 |     Inasmuch as others were able to observe that [Johnson and
14 |     Petitioner] were armed, it may be inferred that each
15 |     defendant would have known the others were armed.  Knowing
16 |     at least some gang members were armed, anyone participating
17 |     in the assault on the bus could have anticipated that
18 |     firearms might be used in the attack.
19
20 | (Ans., Ex. A, p. A-43).
21
22 |     This determination was not objectively unreasonable.  First, even
23 | assuming the record supports the interpretation proffered by
24 | Petitioner, a reviewing court "faced with a record of historical facts
25 | that supports conflicting inferences must presume -- even if it does
26 | not affirmatively appear in the record -- that the trier of fact
27 | resolved any such conflicts in favor of the prosecution, and must
28 | defer to that resolution."  Jackson v. Virginia, 443 U.S. at 326; see

1   also Turner v. Calderon, 281 F.3d 851, 882-84 (9th Cir. 2002) (even

2   though there was "much evidence" supporting petitioner's contention

3   that he did not form intent to rob prior to murder, evidence sufficed

4   to support a contrary interpretation).   To establish the sufficiency

5   of the evidence, "the prosecution need not affirmatively 'rule out

6   every hypothesis except that of guilt.'"   Wright v. West, 505 U.S. at

7   296 (1992) (quoting Jackson v. Virginia, 443 U.S. at 326); see also

8   Hayes v. Woodford, 301 F.3d 1054, 1084 (9th Cir. 2002) (relevant

9   inquiry "is not whether the evidence excludes every hypothesis except

10  guilt, but whether the jury could reasonably arrive at its verdict";

11  citation omitted); Nunez v. Garcia, 2001 WL 940920, at * 8 (N.D. Cal.

12  2001) ("[I]t is not enough to show that there are contrary inferences

13  which are 'simpler, stronger, and more rational' than what was

14  actually decided.   [Petitioner] must demonstrate that no rational jury

15  could draw the various inferences detailed by the state appellate

16  court in support of a conviction.") (original emphasis).

17

18      Second, even restricting the trial evidence to Petitioner's

19  characterization of the evidence, a rational jury could have concluded

20  Petitioner knew the perpetrator intended to kill Bloods on the bus.

21  "[P]resence at the scene of the crime, while insufficient of itself to

22  make one an aider and abettor, is one factor which tends to show

23  intent.   Other factors which may be considered include the defendant's

24  failure to take steps to prevent the commission of the crime,

25  companionship, and conduct before and after the crime."   People v.

26  Pitts, 223 Cal. App. 3d 606, 893, 273 Cal. Rptr. 757, 922 (1990)

27  (citation omitted).   From the evidence, a rational jury could have

28  concluded Petitioner's intent was not to protect his brother.

Petitioner's alleged act of arming himself prior to joining the altercation could have persuaded a rational jury beyond a reasonable doubt that Petitioner shared the perpetrator's intent to kill.[10]  See People v. Sanchez, 12 Cal. 4th 1, 35, 47 Cal. Rptr. 2d 843, 864, 906 P.2d 1129, 1150 (1995), cert. denied, 519 U.S. 835 (1996).  Evidence that Petitioner, armed with a handgun, ran to the bus and then went around to the back of the bus, where the shooting occurred, similarly could have convinced a rational jury beyond a reasonable doubt that Petitioner shared the perpetrator's intent to kill.  See People v. Hill, 17 Cal. 4th 800, 851-52, 72 Cal. Rptr. 2d 656, 685, 952 P.2d 673, 702 (1998) (evidence defendant and two companions approached together and "spread out" to surround robbery victim's car suggested "preconceived plan of attack"; evidence sufficient to support conviction for aiding and abetting robbery).  Furthermore, evidence that Petitioner was affiliated with a gang, fled with the group after the shooting, and laughed and bragged about the shooting the next day also could have convinced a rational jury beyond a reasonable doubt that Petitioner had harbored the requisite intent.  See People v. Salgado, 88 Cal. App. 4th 5, 15-16, 105 Cal. Rptr. 2d 373, 381-82 (2001) (evidence that defendant was present at gang-related carjacking, entered back seat of car after co-defendant took car at gunpoint, and remained a passenger in car during subsequent drive-by shooting and police chase, sufficient to show defendant aided and abetted carjacking).  In short, a rational jury could have concluded from the trial evidence that Petitioner was not an "innocent dupe

---

[10]    As Petitioner apparently concedes, a rational jury could believe Hardy's evidence that Petitioner was armed (Pet. Mem., p. 24).

1  unaware of [his companions'] deadly intentions." See People v.

2  Manriquez, 72 Cal. App. 4th 1486, 1491, 86 Cal. Rptr. 2d 69, 72 (1999)

3  (evidence sufficed to support convictions for first degree murder and

4  attempted murder on aiding and abetting theory, although defendant

5  claimed he was not a "full-blown" gang member, where defendant was

6  friendly with gang members, knew of hostility between rival gangs,

7  knew gang members were going to "shit on" rival gang, knew one gang

8  member had a gun, yelled gang epithet at rival gang members, and

9  "joined the foray" by firing at rival gang members, without hitting

10  anyone).[11]

11

12      Alternatively, the evidence sufficiently supported Petitioner's

13  murder conviction on the "natural and probable consequences" theory of

14  complicity.[12] "A defendant guilty as a aider and abettor under the

15  ————————————

16      [11]   Petitioner misplaces reliance upon federal criminal
    cases discussing the proof required to support a conspiracy
17  conviction.  In determining the constitutional sufficiency of the
    evidence supporting Petitioner's convictions, the Court must
18  apply substantive California law, not federal law.  See Jackson
    v. Virginia, 443 U.S. at 324 n.16; Windham v. Merkle, 163 F.3d
19  1092, 1101 (9th Cir. 1998) (applying California aiding and
    abetting law).
20

21      [12]   The prosecutor argued in closing that, if the jury
    found murder to have been the natural and probable consequence of
22  an armed assault, the murder was second-degree (see R.T. 1529-
    32).  However, California law permits a jury to convict a
23  defendant of first degree murder on a natural and probable
    consequences theory of complicity.  See, e.g., People v.
24  Prettyman, 14 Cal. 4th at 274, 58 Cal. Rptr. 2d at 842.  The
    trial court's instructions on the natural and probable
25  consequences theory of complicity did not restrict the jury to a
    conclusion of second-degree murder if the jury found the murder
26  to have been a natural and probable consequence of the target
    crime of assault with a firearm (see R.T. 1480-81).  The court
27  instructed the jury that "[i]f anything concerning the law said
    by the attorneys in their arguments or at any other time during
28

1  'natural and probable consequences' doctrine need not share the

2  perpetrator's intent to kill." People v. Williams, 16 Cal. 4th 635,

3  691, 66 Cal. Rptr. 2d 573, 608, 941 P.2d 752, 787 (1997), cert.

4  denied, 523 U.S. 1027 (1998).  In determining whether the charged

5  crimes were the natural and probable consequence of the target crimes,

6  the issue "is not whether the aider and abettor actually foresaw the

7  additional crime, but whether, judged objectively, it was reasonably

8  foreseeable." People v. Mendoza, 18 Cal. 4th 1114, 1133, 77 Cal.

9  Rptr. 2d 428, 440, 959 P.2d 735 (1998) (citation omitted); see People

10 v. Olguin, 31 Cal. App. 4th 1355, 1379-80, 37 Cal. Rptr. 2d 596, 607-

11 08 (1994) (aider and abettor may be convicted of murder without

12 finding of specific intent to kill, as long as evidence shows intent

13 to aid and abet target crime; "[i]f that intent is shown, it matters

14 not that the crime actually committed was not intended by the aider

15 and abettor, so long as it was a reasonably foreseeable consequence of

16 the underlying criminal conduct").

17

18   Petitioner argues the evidence did not establish either that

19 Petitioner knew of the "target offense" or that Petitioner took any

20 action in furtherance of it (Trav., p. 10).  However, there existed

21 evidence that Petitioner, armed with a gun, joined a group of people,

22 at least one of whom also was armed, who planned to "beat up" Bloods

23 on the bus.  A rational jury could have concluded from this evidence

24 that Petitioner aided and abetted the target crime of assault and

25 that, under these highly charged circumstances, murder was a natural

26

27 the law, you must follow my instructions" (R.T. 1453).  The jury
   is presumed to have followed the trial court's instructions.  See
28 Weeks v. Angelone, 528 U.S. 225, 226 (2000).

1  and probable consequence of the assault.  See Windham v. Merkle, 163

2  F.3d 1092, 1101-02 (9th Cir. 1998) (where defendant served as lookout

3  while armed perpetrator assaulted two women in an effort to locate

4  rival gang member in order to avenge injury to perpetrator's friend,

5  and defendant assisted perpetrator and others in stealing tires from

6  women's apartment, observed by bystanders, evidence sufficed to show

7  perpetrator's killing of one bystander and wounding of another was a

8  natural and probable consequence of assaults defendant aided and

9  abetted); see also People v. Gonzales, 87 Cal. App. 4th 1, 10-11, 104

10 Cal. Rptr. 2d 247, 253-54 (2001) (evidence supported conclusion that

11 first degree murder was natural and probable consequence of gang

12 assault, where defendants rode in car past rival gang members,

13 passengers in car flashed gang signs, defendants exited the car with

14 perpetrator, who was "visibly armed with a gun," and defendants

15 participated in fight during which perpetrator shot victim, despite

16 one defendant's argument that he did not know perpetrator was armed or

17 intended to use weapon during fistfight); People v. Montes, 74 Cal.

18 App. 4th 1050, 1055-56, 88 Cal. Rptr. 2d 482, 485-86 (1999) (evidence

19 supported determination that attempted murder was natural and probable

20 consequence of target offenses of assault and fighting in public,

21 regardless of whether defendant knew perpetrator was armed; crime

22 arose in context of an ongoing gang rivalry, and from the start,

23 confrontation resulting in shooting was "punctuated by threats and

24 weaponry"; "[g]iven the great potential for escalating violence during

25 gang confrontations, it is immaterial whether Montes specifically knew

26 [perpetrator] had a gun"; citations omitted); People v. Superior Court

27 (Quinteros), 13 Cal. App. 4th 12, 21, 16 Cal. Rptr. 2d 462, 467 (1993)

28 (where defendant and gang associates planned to "beat up" victims,

1   fact that defendant may have been unconscious at time companion
2   administered fatal blow did not absolve defendant of responsibility
3   for "natural and probable consequences" of conspiracy in which he
4   participated); People v. Godinez, 2 Cal. App. 4th 492, 499-500, 3 Cal.
5   Rptr. 2d 325, 329-30 (1992) (in absence of prejudicial jury
6   instruction, evidence would have supported determination that homicide
7   was natural and probable consequence of gang attack, although
8   defendant claimed he did not know companions carried knives; gang
9   expert testified whenever rival gangs meet, violent confrontation is
10  "strongly possible"; jurors entitled to consider "common knowledge"
11  that gang confrontations "all too often result in death"); People v.
12  Montano, 96 Cal. App. 3d 221, 227, 158 Cal. Rptr. 47, 50-51 (1979)
13  (evidence sufficient to show defendant aided and abetted attempted
14  murder, where defendant and his companions duped victim, a rival gang
15  member, into entering car, defendant drove to remote area, and
16  defendant's companions shot victim while defendant remained in car;
17  gang context made homicide a "reasonable and natural consequence" of
18  attack regardless of defendant's asserted lack of awareness companions
19  possessed weapons).
20
21      As the foregoing demonstrates, Petitioner was not convicted on
22  the basis of "guilt by association."  In arguing the contrary,
23  Petitioner relies upon Mitchell v. Prunty, 107 F.3d 1337 (9th Cir.),
24  cert. denied, 522 U.S. 913 (1997), overruled on other grounds,
25  Santamaria v. Horsley, 133 F.3d 1242, amended, 138 F.3d 1280 (9th Cir.
26  1998), cert. denied, 525 U.S. 823, 824 (1998) ("Mitchell").  Mitchell
27  is distinguishable.
28  ///

Mitchell was convicted of the second degree murder of a rival gang member.  Mitchell precipitated a gang fistfight in the street outside Mitchell's apartment building by yelling an insult to a group of rival gang members from his apartment balcony.  Mitchell, 107 F.3d at 1338.  After the fight, Mitchell drove by with his companions, who opened fire on the rival gang members.  Id.  The victim was wounded but not killed.  En route to the hospital, the victim stopped in front of Mitchell's apartment building, got out of the car, and challenged a group of men on Mitchell's balcony to shoot the victim.  Id.  One person in the group held a gun.  Id.  The victim was shot, and lay in the street severely wounded.  Id.  Some of the group, including Mitchell, then entered a car which ran over the victim, causing a mortal injury.  Id. at 1339.

The jury made special findings that Mitchell had not used a gun and had not driven the car that ran over the victim.  Id. at 1339 & n.2.  Therefore, Mitchell only could have been found guilty as an aider and abettor of the murder.  Id. at 1340.

The Ninth Circuit granted Mitchell's petition for writ of habeas corpus, ruling the evidence was unconstitutionally insufficient.  The trial court had answered a jury question by informing the jury that, if Mitchell had allowed firearms to be brought into his apartment with the intent to use them in the crime of first or second degree murder, Mitchell could be convicted.  Id. at 1341.  The Ninth Circuit held that, although the instruction was correct, the evidence showed that Mitchell had admitted the armed gang members into his apartment prior to the time the victim appeared in the street to taunt his

adversaries.  Therefore Mitchell's act of allowing guns or letting his companions onto the balcony of his apartment could not have been performed with the intent to aid and abet a murder.  Id.  The Ninth Circuit recognized that, under California law, an aider and abettor could be found guilty of crimes which were the "natural and probable consequence" of the intended crime aided and abetted.  Id. at 1341 n.9.  However, the Court stated there was "no evidence that Mitchell intentionally aided and abetted second degree murder or any other crime (such as assault) of which second degree murder was a natural and probable consequence."  Id. (emphasis added).

Arguably, Mitchell could have been charged with aiding and abetting the first drive-by assault upon the victim, because Mitchell drove the car from which the shots were fired.  See, e.g., People v. Flores, 7 Cal. App. 4th 1350, 1361, 9 Cal. Rptr. 2d 754, 760 (1992) (jury could have found gang killing was "natural and probable consequence" of acts of defendant, who drove car, then stopped car and turned off lights as companion fired out window).  However, Mitchell was not charged with aiding and abetting any crime other than the murder itself, and the state did not argue the first shooting caused the lethal injury.  Id. at 1340.

The Ninth Circuit also held the evidence insufficient to hold Mitchell criminally liable for the car assault upon the victim (which was the actual cause of death).  The Court deemed Mitchell's mere presence in the car insufficient, in the absence of proof Mitchell provided the car or otherwise encouraged the driver.  Id. at 1342. The Court branded the state's argument that Mitchell fled with his

1  fellow gang members as an argument for "guilt by association."   Id.

3      In contrast to the circumstances in Mitchell, Petitioner's
4  conviction did not rest solely upon evidence of his association with
5  gang members.  From the evidence, a rational jury could have
6  concluded, beyond a reasonable doubt, that Petitioner armed himself
7  with a gun and joined an armed group of gang members in an
8  orchestrated attack upon a rival gang.  The California Court of
9  Appeal's rejection of Petitioner's claim of insufficiency of the
10 evidence was not contrary to, or an objectively unreasonable
11 application of, clearly established Supreme Court law.  See 28 U.S.C.
12 § 2254(d).

14      Therefore, the Double Jeopardy Clause does not bar a retrial of
15 Petitioner.  See Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir.
16 2003) (United States Supreme Court decisions establish that, if the
17 first trial resulted in a conviction on sufficient evidence, the
18 Double Jeopardy Clause "imposes no limitations whatever upon the power
19 to retry a defendant who has succeeded in getting his first conviction
20 set aside"; quoting United States v. DiFrancesco, 449 U.S. 117
21 (1980)); United States v. Fisher, 106 F.3d 622, 624 n.1 (5th Cir.
22 1997), abrogated on other grounds by Ohler v. United States, 529 U.S.
23 753 (2000) (no double jeopardy obstacle to remand for a new trial upon
24 discerning Brady error); cf. United States v. Doyle, 121 F.3d 1078,
25 1083 (7th Cir. 1997) (suggesting in dicta that the Double Jeopardy
26 Clause might prevent retrial after a Brady-related reversal of a
27 conviction on sufficient evidence if, but only if, the prosecution
28 committed the Brady error with the specific intent of aborting the

1 | first trial); <u>United States v. Wallach</u>, 935 F.2d 445 (2nd Cir. 1991)
2 | (suggesting in <u>dicta</u> that the Double Jeopardy Clause might prevent
3 | retrial following reversal of a conviction on sufficient evidence if,
4 | but only if, the prosecution committed misconduct at the first trial
5 | with the specific intent of avoiding an acquittal that the prosecution
6 | reasonably believed otherwise likely to occur).

7
8 |                                    **RECOMMENDATION**
9
10 |     For all of the foregoing reasons, IT IS RECOMMENDED that the
11 | Court issue an Order:  (1) approving and adopting this Report and
12 | Recommendation; and (2) directing that Judgment be entered
13 | conditionally granting habeas relief.

14
15 |     DATED:  May 16, 2003.

16
17
18
19 |                                   CHARLES F. EICK
                                 UNITED STATES MAGISTRATE JUDGE
20
21
22
23
24
25
26
27
28

56

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.



LODGED
CLERK, U.S. DISTRICT COURT
MAY 16 2003
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDALL AMADO, | NO. CV 03-00078-PA(E) |
|        Petitioner, | |
|   v. | ORDER ADOPTING FINDINGS, |
| EDWARD S. ALAMEIDA, JR., | CONCLUSIONS AND RECOMMENDATIONS OF |
|        Respondent. | UNITED STATES MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the pleadings and papers herein and the attached Report and Recommendation of United States Magistrate Judge.  The Court approves and adopts the Magistrate Judge's Findings, Conclusions and Recommendations.

IT IS ORDERED that: (a) Petitioner's claim of insufficiency of the evidence is denied and dismissed with prejudice; and (b) a conditional writ of habeas corpus is granted with respect to Petitioner's <u>Brady</u> claim.  Respondent shall release Petitioner from custody and discharge him from all adverse consequences of his conviction in Superior Court Case No. TA037534, unless Petitioner is

brought to retrial within ninety (90) days of the date the Judgment
herein becomes final, plus any additional delay authorized under State
law.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this
Order, the Report and Recommendation of United States Magistrate Judge
and the Judgment by United States mail on Petitioner and all counsel
of record.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: _____, 2003.


_____
PERCY ANDERSON
UNITED STATES DISTRICT JUDGE



LODGED
JUDGED
CLERK, U.S. DISTRICT COURT
MAY 16 2003
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY
BY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RANDALL AMADO, | ) | NO. CV 03-00078-PA(E) |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGMENT |
| | ) | |
| EDWARD S. ALAMEIDA, JR., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

Pursuant to the Order of the Court Adopting the Findings,
Conclusions and Recommendations of the United States Magistrate Judge,
IT IS ADJUDGED that: (a) Petitioner's claim of insufficiency of the
evidence is denied and dismissed with prejudice; and (b) a conditional
writ of habeas corpus is granted with respect to Petitioner's <u>Brady</u>
claim. Respondent shall release Petitioner from custody and discharge
him from all adverse consequences of his conviction in Superior Court

///

///

///

///

1 │ Case No. TA037534, unless Petitioner is brought to retrial within

2 │ ninety (90) days of the date this Judgment becomes final, plus any

3 │ additional delay authorized under State law.

4

5 │         DATED: _____, 2003.

6

7

8

9                           _____
                                  PERCY ANDERSON
                            UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2