1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   RANDALL AMADO, | No. CV 03-00078 PA (E) |
| 12      Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY |
| 13    v. | |
| 14   EDWARD S. ALAMEDA, JR., | |
| 15      Respondent. | |

16

17

18      The Court has before it petitioner Randall Amado's ("Petitioner") Petition for Writ of

19   Habeas Corpus by a Person in State Custody, filed January 6, 2003.  Respondent filed an

20   Answer on February 26, 2003, and Petitioner filed a Traverse on March 19, 2003.  The

21   Magistrate Judge assigned to this action filed a Report and Recommendation on May 16,

22   2003.  The Magistrate's Report recommends that the writ of habeas corpus be conditionally

23   granted, and that Petitioner be released or retried within ninety (90) days.  After carefully

24   reviewing the record in this action, the Court declines to adopt the Magistrate's

25   Recommendation.

26      In his Petition, Petitioner alleges that he is being unlawfully detained on the following

27   grounds:  (1) the trial court erred in denying the Petitioner's motion for a new trial because

28   evidence concerning the credibility of a crucial prosecution witness was not disclosed pre-

1  trial in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215

2  (1963); (2) the evidence was insufficient to prove that Petitioner had aided and abetted Pugh

3  and Johnson; (3) the Fifth and Sixth Amendments to the U.S. Constitution require that

4  Petitioner know his accomplice was armed in order to be convicted under an aiding and

5  abetting theory; and (4) CALJIC Instruction No. 2.90, which defines reasonable doubt,

6  violates the Fifth and Sixth Amendments to the U.S. Constitution.

7  I.     Factual Background

8      Robert Johnson ("Johnson"), William Pugh ("Pugh"), and Petitioner were tried for

9  crimes arising out of a gang-related shooting into a Metropolitan Transit Authority ("MTA")

10  bus. The shooting resulted in the death of Corrie Williams and the wounding of Tammy

11  Freeman. Both victims were students at Centennial High School.

12      MTA route 53 ran through areas claimed by two different Los Angeles gangs—the

13  Crips and the Bloods. There is a longstanding rivalry between the two gangs, and especially

14  between the 118 East Coast Crips and the Bounty Hunter Bloods. Route 53 would pass

15  through the area around Avalon Boulevard Highway, an area claimed by the 118 East Coast

16  Crips as their territory, and stop at Centennial High School, which is located in an area

17  claimed by the Bounty Hunter Bloods. Persistent problems existed on this route because the

18  Bloods and Crips would insult and intimidate one another while they were traveling through

19  each other's territory.

20      Johnson is a member of the 118 East Coast Crips, and goes by the moniker "Baby

21  Kiko." Pugh is also a member of the 118 East Crips, goes by the moniker "Li'l Evil," and at

22  the time was the leader of the "Little Ones," a group of young gang members like Johnson.

23  Petitioner was frequently seen in the company of the Imperial Block Crips, another group on

24  friendly terms with the 118 East Coast Crips. Petitioner goes by the moniker "Bang."

25      Pugh and Johnson thought it disrespectful for the Bloods to travel through their

26  neighborhood. They were tired of the Bloods displaying gang signs and yelling out of the

27  windows when the bus went through their territory. They decided they would get on the bus

28  the next time Bloods were on board, beat up the Bloods, and then get off at the next stop.

-2-

1    On January 16, 1997, the bus stopped in front of Centennial High School and picked

2 up approximately 25 to 30 students, several of whom were wearing red, a color associated

3 with the Bloods. As the bus neared a stop in the Crips' territory, a group of young men

4 crossed the street towards the bus. When the bus pulled up, the group, some of whom were

5 Crips, were waiting at the stop.

6    Pugh yelled, "Y'all ready?" before the group boarded the bus. Pugh and others

7 identified themselves as Crips, and began shouting epithets aimed at the Bloods aboard the

8 bus. One member of the group shouted, "Shoot this mother fucking bus up," and the men

9 then exited the bus. As the bus pulled away from the stop, Johnson stuck a pistol through

10 one of the back windows and fired several times. One bullet struck and killed Corrie

11 Williams, a high school senior who had boarded the bus at the Centennial High School stop.

12 Another struck Tammy Freeman, also a Centennial High senior, wounding her in the upper

13 arm. Johnson and the group of young men behind the bus turned and ran together from the

14 scene in the same direction.

15    Petitioner was tried on an aiding and abetting theory for first degree murder,

16 attempted murder, assault with a firearm, and shooting into an occupied vehicle. At the trial,

17 the prosecution called Warren Hardy ("Hardy") as a witness. Hardy called the police the day

18 after the shooting and informed them that a group of men were outside his home laughing

19 and talking about the shooting.[1/] During the call, Hardy indicated that the individuals were

20 the same men he believed had done the shooting the preceding day. In response to Hardy's

21 call, the police came to the scene and detained the men. Petitioner was among the men

22 arrested. At trial, Hardy testified to the events he claimed took place outside his home. He

23 also claimed to have seen a "short chubby boy in the back with a handgun with a black

24 handle," a description that fit Petitioner, in the group that assaulted the bus, but could not

25 identify Petitioner at trial as the individual. However, he also indicated that he was

26

27

28 [1/]    When contacting the police, Hardy identified himself as "Warren Collins." It was later determined that the caller was in fact Hardy.

-3-

1  concerned for his safety, did not want to testify, and was unable to remember statements he

2  had given to police earlier.

3        Petitioner was convicted by a jury and sentenced to a total term of twenty-seven years

4  to life.  After trial, Petitioner's counsel submitted a motion for a new trial based on the

5  prosecution's failure to provide Petitioner's counsel with impeachment evidence concerning

6  Hardy.  Specifically, Petitioner argued that the prosecution had failed to provide information

7  that Hardy:  (1) had a felony record at the time he testified in Petitioner's trial; (2) had been

8  convicted of robbery in Los Angeles Superior Court in 1997; (3) was on probation at the

9  time he testified at Petitioner's trial; (4) at one time was a "Scottsdale Piru Blood"; and was

10 awaiting trial on a murder charge when he testified against Petitioner.  The Court denied the

11 motion, ruling that in light of the other evidence linking Petitioner to the crimes and

12 counsel's "aggressive cross examination" of Hardy,[2] the alleged newly discovered evidence

13 did not "reach[] the level that warrants a new trial."  The Court of Appeal affirmed, noting

14 with regard to Petitioner's Brady claim, that the "record before us does not establish the

15 prosecution's failure under Brady to reveal this information to defense counsel."  The

16 California Supreme Court denied Petitioner's petition for review.

17 II.    Discussion

18       Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

19 federal court may grant a writ of habeas corpus to a state prisoner only if the state court's

20 decision is "contrary to, or involves an unreasonable application of, clearly established

21 Federal law, as determined by the Supreme Court of the United States," or is "based on an

22 unreasonable determination of the facts in light of the evidence presented" to the state court.

23 28 U.S.C. § 2254(d).  A state court's decision is "contrary to" federal law if the state court

24 "failed to apply the correct controlling authority from the Supreme Court," Benn v. Lambert,

25 283 F.3d 1040, 1051 (9th Cir. 2002) (quoting Shackleford v. Hubbard, 234 F.3d 1072, 1077

26

27 [2]    At trial, Hardy was cross-examined and his credibility impeached by his failure to

28 identify petitioner at trial, his inability to recall the events on the day of the shooting, and his
   poor eyesight.

1   (9th Cir. 2000)), and "constitutes an 'unreasonable application' of federal law 'if the state

2   court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of

3   the particular state prisoner's case.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 405-07,

4   120 S. Ct. 1495, 1519-20, 146 L. Ed. 2d 2389 (2000)).

5       A.    Petitioner's *Brady* Claim

6       A petitioner must prove three elements to establish a Brady violation:  (1) the

7   evidence at issue must be favorable to the accused; (2) the evidence must have been

8   suppressed by the State; and (3) prejudice must have ensued.  Strickler v. Greene, 527 U.S.

9   263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).  Petitioner must satisfy all

10  three components before a habeas petition based on a Brady violation may be granted.  Id. at

11  296, 119 S. Ct. at 1955.

12      Petitioner raised his Brady claim in the motion for a new trial he filed in the trial

13  court.  The court denied the motion, ruling that in light of the other evidence linking

14  Petitioner to the crimes and counsel's "aggressive cross examination" of Hardy, the alleged

15  newly discovered evidence did not "reach[] the level that warrants a new trial."  Petitioner

16  appealed, arguing that the trial court's failure to grant a new trial violated his Brady rights.

17  The Court of Appeal affirmed, finding that "[t]he record before us does not establish the

18  prosecution's failure under Brady to reveal this information to defense counsel."

19  Specifically, with respect to Petitioner's Brady claim, the Court of Appeal held:

20          Hardy's declaration establishes what evidence would be
            available and its materiality (relevance to impeachment).  It does
21          not establish that the evidence is indeed newly discovered,
            however, nor does it establish that defense counsel could not
22          have discovered the impeaching facts in the exercise of due
            diligence.  The record before us does not establish the
23          prosecution's failure under Brady to reveal this information to
            defense counsel.  Accordingly, defense counsel must
24          demonstrate the newly-discovered nature of the evidence and an
            inability to discover and produce the evidence at trial, with the
25          exercise of due diligence, in order to be entitled to a new trial. . .
            . [H]e must do this with the best available evidence, in this case,
26          counsel's declaration.  While counsel did state at the hearing that
            he did not discover Hardy's prior felony conviction and former
27          gang affiliation until after the trial, he was making argument, not

28

> testifying under oath, when he did so.  His statement therefore is
> not evidence that the foregoing facts were newly discovered.[3/]
>
> In short, defendant Amado failed to produce any evidence
> to establish that the impeaching facts about Hardy were newly
> discovered . . . . His failure to do so warranted denial of the
> motion.

People v. Johnson, No. B129670 at 16-17 (Cal. Ct. App. June 14, 2001).  As an initial

matter, given that the Court of Appeal decided that the record did not establish a Brady

violation, it is clear that the decision was not "contrary to" Supreme Court authority.  Benn,

283 F.3d at 1051.  Accordingly, this Court must decide whether the Court of Appeal

"unreasonably applied" Brady to the facts of this case.  Id.

       1.    Favorability of Evidence

The duty to disclose evidence "favorable" to the defense includes the duty to disclose

impeachment evidence material to the credibility of a prosecution witness.  Strickler, 527

U.S. at 280, 119 S. Ct at 1948.  "[F]avorable evidence is that which relates to guilt or

punishment, and which tends to help the defense by either bolstering the defense's case or

impeaching prosecution witnesses."  United States v. Sudikoff, 36 F. Supp. 2d 1196, 1199

(C.D. Cal. 1999) (citations omitted).  Evidence is relevant to the determination of the case

"if it has a mere tendency to impeach a witness' credibility by a showing of bias or

coercion."  United States v. Hankey, 203 F.3d 1160, 1171 (9th Cir. 1999).  Proof of bias is

relevant because "the jury, as finder of fact and weigher of credibility, has historically been

entitled to assess all evidence which might bear on the accuracy and truth of a witness'

testimony."  Id.

Knowledge of Hardy's felony record could have been used by the defense for

impeachment purposes.[4/]  See Hankey, 203 F.3d at 1173 (finding gang-related evidence

---

[3/]    The Court notes that Petitioner's counsel on appeal had not previously served as
Petitioner's trial counsel.  Accordingly, it is not clear how Petitioner's appellate counsel's
statements concerning when he discovered the information are relevant.

[4/]    California Evidence Code section 788 allows the admission of prior felony
(continued...)

1   admissible for impeachment purposes).  Membership in a rival gang would obviously be a

2   consideration in evaluating any potential bias Hardy might have harbored towards Petitioner,

3   and would call into question Hardy's credibility and motivation for initially calling the

4   police with information.  Hardy was the prosecution's only witness who allegedly saw

5   Petitioner carrying a gun as he approached the bus and the only witness who said Petitioner

6   laughed and bragged about the shooting the following day.  As such, it is reasonable to find

7   the potential impeachment evidence "favorable" for purposes of evaluating Petitioner's

8   Brady claim.

9                    2.    State's Suppression of Evidence

10          The second component of a Brady violation is suppression of the evidence by the

11  state.  Strickler, 527 U.S. at 282, 119 S. Ct. at 1948.  "The government may not suppress . . .

12  information known to them . . . which may diminish the credibility of the evidence relied on

13  to tell the story."  United States v. Siriprechapong, 181 F.R.D. 416, 422 (N.D. Cal. 1998).

14  The prosecution must disclose "information known to or available to them which may

15  develop doubt about the truth of the Government's narrative."  Id.  This duty includes the

16  disclosure of evidence "known only to the police investigators and not to the prosecutor,"

17  thus requiring "individual prosecutor[s] . . . to learn of any favorable evidence known to the

18  others acting on the government's behalf in [the] case, including the police."  Kyles v.

19  Whitley, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568, 131 L. Ed. 2d 490 (1995).

20          Respondent does not dispute that the alleged Brady material was possessed by the

21  state at the time of Petitioner's trial.  While it is unclear from the record whether the

22  individual who prosecuted Petitioner at trial had actual knowledge of the Brady material, the

23  court in Carriger v. Stewart, 132 F.3d 463, 479-80 (9th Cir. 1997), imposed an affirmative

24  obligation on the prosecutor to learn of any exculpatory information known to those acting

25  on the state's behalf.  This obligation includes obtaining available information on the

26  criminal history of a prosecution witness.  Id.  In Strickler, the Supreme Court held that the

27  _____

28  [4/]    (...continued)
    convictions to attack the credibility of witnesses.  See also Fed. R. Evid. 609(a).

1  prosecution's maintenance of an open file policy which did not include all the evidence in

2  possession of the prosecution constituted "suppression" for purposes of a <u>Brady</u> violation.

3  <u>Strickler</u>, 527 U.S. at 284-285, 119 S. Ct. at 1949-50 ("[I]t was reasonable for trial counsel

4  to rely on, not just the presumption that the prosecutor would fully perform his duty to

5  disclose all exculpatory materials, but also the implicit representation that such materials

6  would be included in the open files tendered to defense counsel for their examination.").

7         At Petitioner's arraignment, the court ordered the investigating officer to appear with

8  the "entire discovery package" on the next scheduled court date.  Under California law, the

9  prosecution is required to disclose "[t]he existence of a felony conviction of any material

10  witness whose credibility is likely to be critical to the outcome of the trial," as well as "any

11  exculpatory evidence."  Cal. Penal Code §§ 1054.1(d) & (e).[5/]  The duty to disclose exists

12  even though there has been no request by the accused.  <u>Strickler</u>, 527 U.S. at 280, 119 S. Ct.

13  at 1948 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399, 49 L. Ed.

14  2d 342 (1976)).  Because the witnesses allegedly feared for their safety, the prosecutor filed

15  a motion to prevent disclosure of witness addresses and phone numbers.  After hearing from

16  some witnesses, the court ruled that the prosecution did not have to disclose that

17  information.  The court did, however, obtain a promise from the prosecutor to make the

18  witnesses available to defense counsel.  On November 6, 1998, counsel for one of

19

20  _____

[5/]      Petitioner's counsel would have had to obtain a court order to view Hardy's rap sheet.

21  As the California Court of Appeal has explained:

22              [I]t is the policy of the Department of Justice to release rap
             sheets only to prosecutors, and defense disclosure requests must
23           go through the prosecutor's office.  Not only does the prosecutor
             have reasonable access to rap sheets, he is the assigned
24           doorkeeper. . . . If a felony conviction exists, the prosecutor shall
             disclose that information to the defendant or his attorney at least
25           30 days prior to trial, unless good cause is shown why a
             disclosure should be denied, restricted, or deferred.
26

27

28  People v. Little, 59 Cal. App. 4th 426, 432-433, 68 Cal. Rptr. 2d 907, 911 (1997) (internal
   citations, quotation marks, and footnotes omitted).

1   Petitioner's co-defendants interviewed Hardy at the courthouse.  There is no indication that

2   Petitioner's counsel participated in that interview.  Hardy testified beginning on November

3   17, 1998.

4        Although the prosecutor has an affirmative duty to disclose exculpatory evidence, the

5   Ninth Circuit has held that there is no suppression by the government when a defendant has

6   enough information to be able to ascertain the supposed <u>Brady</u> materials on his own.  <u>United</u>

7   <u>States v. Bracy</u>, 67 F.3d 1421, 1429 (9th Cir. 1995).  Here, in premising its rejection of

8   Petitioner's <u>Brady</u> claim on his failure "to produce any evidence to establish that the

9   impeaching facts about Hardy were newly discovered and could not have been discovered

10  and produced at trial in the exercise of due diligence, let alone the best available evidence,"

11  <u>People v. Johnson</u>, No. B129670 at 17, the Court of Appeal concluded that Petitioner had

12  not met his burden to establish suppression by the government.

13       Importantly, Petitioner's trial counsel had, but did not take advantage of, an

14  opportunity to interview Hardy prior to trial.  Perhaps because Petitioner's counsel could

15  have interviewed Hardy prior to his trial testimony and learned of his gang membership and

16  criminal convictions, the declaration he submitted to the Court of Appeal in support of

17  Petitioner's appeal does not state that he lacked the information to discover the <u>Brady</u>

18  material on his own.  <u>See Bracy</u>, 67 F.3d at 1429.  Accordingly, it was not unreasonable for

19  the Court of Appeal to reject Petitioner's <u>Brady</u> claim based on its conclusion that he failed

20  "to produce any evidence to establish that the impeaching facts about Hardy were newly

21  discovered and could not have been discovered and produced at trial in the exercise of due

22  diligence."  Absent an unreasonable application of <u>Brady</u> by the Court of Appeal, this Court

23  cannot grant habeas relief.  <u>See Brown v. Payton</u>, __ U.S. __, __, 125 S. Ct. 1432, 1439, 161

24  L. Ed. 2d 334 (2005) ("A state-court decision involves an unreasonable application of this

25  Court's clearly established precedents if the state court applies this Court's precedents to the

26  facts in an objectively unreasonable manner."); <u>id.</u> at __, 125 S. Ct. at 1443, 161 L. Ed. 2d

27  334 (Breyer, J., concurring) ("[A] federal judge must leave in place a state-court decision

28  unless the federal judge believes that it is 'contrary to, or involved an unreasonable

-9-

1   application of, clearly established Federal law, as determined by the Supreme Court of the

2   United States.'") (quoting 28 U.S.C. § 2254(d)(1)); <u>Bell v. Cone</u>, 543 U.S. 447, ___, 125 S.

3   Ct. 847, 853, 160 L. Ed. 2d 881 (2005) ("As we have said before, § 2254(d) dictates a

4   'highly deferential standard for evaluating state-court rulings,' which demands that state-

5   court decisions be given the benefit of the doubt.") (quoting <u>Lindh v. Murphy</u>, 521 U.S. 320,

6   333 n.7, 117 S. Ct. 2059, 2067 n.7, 138 L. Ed. 2d 481 (1997)); <u>Yarborough v. Gentry</u>, 540

7   U.S. 1, 5, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003) ("Where, as here, the state court's

8   application of governing federal law is challenged, it must be shown to be not only

9   erroneous, but objectively unreasonable.").

10          Because the Court of Appeal's finding that the prosecution did not suppress the

11   exculpatory evidence is not objectively unreasonable, Petitioner's <u>Brady</u> claim must fail.

12                      3.      Prejudice

13          Finally, prejudice must result from the prosecution's suppression of favorable

14   evidence in order for the Court to find a <u>Brady</u> violation. <u>Strickler</u>, 527 U.S. at 282, 119 S.

15   Ct. 1948. "Prejudice is determined by looking at the cumulative effect of the withheld

16   evidence and asking 'whether the favorable evidence could reasonably be taken to put the

17   whole case in such a different light as to undermine confidence in the verdict.'" <u>Killian v.</u>

18   <u>Poole</u>, 282 F.3d 1204, 1210 (9th Cir. 2001) (quoting <u>Strickler</u>, 527 U.S. at 290, 119 S. Ct.

19   at 1952); <u>see also</u> <u>United States v. Agurs</u>, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 2402, 49 L.

20   Ed. 2d 342 (1976) ("If there is no reasonable doubt about guilt whether or not the additional

21   evidence is considered, there is no justification for a new trial.").

22          "The mere possibility that an item of undisclosed information might have helped the

23   defense, or might have affected the outcome of the trial, does not establish 'materiality' in

24   the constitutional sense." <u>Agurs</u>, 427 U.S. at 109-110, 96 S. Ct. at 2400.[6/]  In some cases,

25   evidence affecting the credibility of a government witness has been found to be material

26

27   [6/]     It should be noted that "[t]he terms 'material' and 'prejudicial' are used

28   interchangeably in <u>Brady</u> cases. Evidence is not 'material' unless it is 'prejudicial,' and not
     'prejudicial' unless it is 'material.'" <u>Benn</u>, 283 F.3d at 1053 n.9.

1   under <u>Brady</u>.  <u>See, e.g.</u>, <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L.

2   Ed. 2d 104 (1972); <u>United States v. Butler</u>, 567 F.2d 885, 890 (9th Cir. 1978); <u>United States</u>

3   <u>v. Shaffer</u>, 789 F.2d 682, 689 (9th Cir. 1986).  "For purposes of determining prejudice, the

4   withheld evidence must be analyzed in the context of the entire record."  <u>Benn</u>, 283 F.3d at

5   1053.

6        Under applicable law, Petitioner has failed to show that the favorable impeachment

7   evidence puts the case "'in such a different light as to undermine confidence in the verdict.'"

8   <u>Strickler</u>, 527 U.S. at 290, 199 S. Ct. at 1952 (quoting <u>Kyles</u>, 514 U.S. at 435, 115 S. Ct. at

9   1566); <u>see also</u> <u>Benn</u>, 283 F.3d at 1056 ("Where . . . there is reason to believe that the jury

10  relied on a witness's testimony to reach its verdict despite the introduction of impeachment

11  evidence at trial, and there is a reasonable probability that the suppressed impeachment

12  evidence, when considered together with the disclosed impeachment evidence would have

13  affected the jury's assessment of the witness's credibility, the suppressed impeachment is

14  prejudicial.").  However, this Court finds the circumstances present in <u>Benn</u> distinguishable

15  from those presently before the Court.  Patrick, the prosecution's <u>Brady</u> witness in <u>Benn</u>,

16  was central to the case, and the suppressed evidence consisted of the witness' history of

17  unprosecuted drug use while acting as a police informant, his repeated lies to the police, and

18  his willingness to fabricate crimes in order to gain benefits for himself.  <u>Benn</u>, 283 F.3d at

19  1054-55.  This was especially critical given that Patrick was a jailhouse informant who

20  resided on Benn's cellblock, and provided the police with inculpatory statements purportedly

21  made by Benn while awaiting trial.  In Petitioner's case, the prosecution presented testimony

22  at trial from two eyewitnesses in addition to Hardy that placed Petitioner at the scene of the

23  shooting.  The additional information Hardy provided was not "central" to the prosecution's

24  case as was the information provided by Patrick in the prosecution of Benn.  Furthermore,

25  and most importantly, the <u>Benn</u> Court did not hang its hat on the existence of suppressed

26  information alone.  Instead, the court specifically found "that the withheld impeachment

27  evidence, <u>when analyzed collectively</u>, materially undermines our confidence in the verdict."

28  <u>Benn</u>, 283 F.3d at 1056 (emphasis added).

1          Strickler is a more analogous case.  Strickler's habeas petition relied on Brady

2    material that seriously cast doubt on a prosecution witness' assertion regarding her

3    "exceptionally good memory" at trial.  Strickler, 527 U.S. at 272-73, 119 S. Ct. at 1944.

4    Petitioner argued that had the alleged Brady evidence been disclosed to defense counsel, it

5    could have been used for impeachment purposes and might have produced a different result

6    at the guilt or sentencing phases.  Id. at 291, 119 S. Ct. at 1953.  However, the Supreme

7    Court reiterated the district court's position that Strickler's burden was to establish a

8    reasonable probability of a different result had the witness' testimony been discounted by the

9    jury.  Id. at 300-01, 119 S. Ct. at 1957-58 (Souter & Kennedy, JJ., concurring) ("[I]t is

10   misleading in Brady cases to use the term 'probability,' which is naturally read as the

11   cognate of 'probably' and thus confused with 'more likely than not,' . . . We would be better

12   off speaking of a 'significant possibility' of a different result to characterize the Brady

13   materiality standard." (citations omitted)).  The Court went on to note the importance of

14   eyewitness testimony at petitioner's trial:  two additional eyewitnesses had placed petitioner

15   at the scene of the crime and saw petitioner driving near the scene of the crime in the

16   victim's vehicle.  Id. at 294, 119 S. Ct. at 1954.  In light of this evidence, the Court found

17   that there was strong support for the conclusion that Strickler would have received the same

18   sentence and punishment even if the witness in question had been severely impeached at

19   trial.  Id.

20         Thus, the proper standard is whether "there is a reasonable probability that the result

21   of the trial would have been different if the suppressed [evidence] had been disclosed to the

22   defense," id. at 289, 119 S. Ct. at 1952, and this Court must therefore consider the evidence

23   against Petitioner absent Hardy's testimony regarding Petitioner's possession of a handgun

24   and his claim that Petitioner laughed and bragged about the shooting.

25         Considering the withheld evidence "in the context of the entire record," Benn, 283

26   F.3d at 1053, Petitioner has failed to demonstrate a reasonable probability that the jury

27   would have returned with a different verdict if Hardy's testimony had been severely

28   impeached.  Hardy had been less than a stellar witness for the prosecution.  He attempted to recant

much of his testimony and had been impeached by defense counsel.  In light of the substantial

evidence against Petitioner on the prosecution's aiding and abetting theory, and

notwithstanding Hardy's statements, the non-disclosure of the <u>Brady</u> material does not

"undermine" this Court's "confidence in the verdict."  <u>Strickler</u>, 527 U.S. at 290, 119 S. Ct.

at 1952.  Accordingly, the Court concludes that Petitioner's asserted <u>Brady</u> claim does not

entitle him to habeas relief.

> B.      Sufficient Evidence Supports Petitioner's Conviction

Petitioner was tried and convicted as an aider and abettor.  The court identified the

target crimes as assault with a firearm and assault.  This is particularly important because

under an aiding and abetting theory, Petitioner is liable to the extent of the natural and

probable consequences of the initial target acts:

> A defendant whose liability is predicated on his status as an
> aider and abettor need not have intended to encourage or
> facilitate the particular offense ultimately committed by the
> perpetrator.  His knowledge that an act which is criminal was
> intended and this action taken with the intent that the act be
> encouraged or facilitated are sufficient to impose liability on him
> for any reasonably foreseeable offense committed as a
> consequence by the perpetrator.

<u>People v. Prettyman</u>, 14 Cal. 4th 248, 261, 58 Cal. Rptr. 2d 827, 834 (1996).

California law is clear that the natural and probable consequences doctrine applies to

accomplice liability in the context of gang confrontations.  <u>See, e.g.</u>, <u>People v. Montes</u>, 74

Cal. App. 4th 1050, 1056, 88 Cal. Rptr. 2d 482, 486 (1999); <u>People v. Olguin</u>, 31 Cal. App.

4th 1355, 1382, 37 Cal. Rptr. 2d 596, 610 (1994); <u>People v. Godinez</u>, 2 Cal. App. 4th 492,

501 n.5, 3 Cal. Rptr. 2d 325, 330 n.5 (1992); <u>People v. Montano</u>, 96 Cal. App. 3d 221, 227,

158 Cal. Rptr. 47, 50-51 (1979).  For example, in <u>Montes</u>, the Court of Appeal affirmed the

conviction of Montes for attempted murder under an aiding and abetting theory based on

target offenses of:  (1) assault with a semiautomatic firearm, (2) simple assault, and (3)

breach of the peace for fighting in public.  The court noted that the target offenses "arose in

the context of an ongoing rivalry" between two gangs which acted violently towards each

other, and found that although Montes contended he was not aware his companion was

armed, it was nevertheless "reasonably foreseeable the initial confrontation would quickly

escalate." Montes, 74 Cal. App. 4th at 1056, 88 Cal. Rptr. 2d at 486. As a result, the court

held that the only requirement to affirm Montes' conviction was "that defendant share the

intent to facilitate the target criminal act and that the crime committed be a foreseeable

consequence of the target act." Id.; see also Cal. Penal Code § 12022.53(e)(1) (imposing

vicarious liability on aiders and abettors who commit crimes in connection with criminal

street gangs). In so holding, the court further observed that:

> When rival gangs clash today, verbal taunting can quickly give
> way to physical violence and gun fire. No one immersed in the
> gang culture is unaware of these realities, and we see no reason
> the courts should turn a blind eye to them. Given the great
> potential for escalating violence during gang confrontation, it is
> immaterial whether [Montes] specifically knew [his companion]
> had a gun.

Montes, 74 Cal. App. 4th at 1056, 88 Cal. Rptr. 2d at 486. The fact that the state proceeded

against Petitioner on an aiding and abetting theory is notable: if the prosecution had only to

demonstrate the requisite intent to assault members of the rival gang on the school bus,

Hardy's testimony regarding possession of a firearm and subsequent statements the

following day become significantly less "central" to the prosecution's case.

California law is also clear that mere presence at the scene of a crime is insufficient

to establish aider and abettor liability. See People v. Salgado, 88 Cal. App. 4th 5, 15, 105

Cal. Rptr. 2d 373, 381-82 (2001) ("Aiding and abetting requires a person to promote,

encourage, or instigate the crime with knowledge of its unlawful purpose."). However, the

record in this case demonstrates much more than Petitioner's mere presence at the scene.

Prosecution witness John Grisson identified Petitioner at trial as someone he saw running

with the group of kids who shot at the bus. He testified that he saw this "group of kids who

shot at the bus" at the corner of 115th Street and that they "ran across the street towards

where the bus was." Prosecution witness Natasha Barner, who was Pugh's girlfriend,

testified that she personally saw Petitioner approach the bus. She testified that Petitioner

was with the crowd when he walked up from 115th Street and that he was part of the group

-14-

that approached the bus stop on Avalon.  Barner also testified that Petitioner and Pugh had been together a couple of times at her apartment.  Nicholas Briggs, another prosecution witness, who was a former member of the Imperial Block Crips and an associate of Petitioner, testified he had seen Petitioner in the company of members of the Imperial Block Crips gang, a gang whose members became members of the 118 East Coast Crips.  He also testified that he knew both Pugh and Johnson as members of the 118 East Coast Crips.  A third witness for the prosecution, Gracie McKenzie, testified that Petitioner bore the moniker "Bang."  Both Barner and McKenzie identified Petitioner as belonging to a gang, although they could not identify specifically which gang.  Following the shooting, Petitioner was seen running away from the bus along with Johnson and the group of individuals who had initially approached the bus.  Presence when the crime is committed, companionship, and conduct before and after its commission are factors in determining whether a defendant has aided and abetted. People v. Campbell, 25 Cal. App. 4th 402, 409, 30 Cal. Rptr. 2d 525, 529 (1994).

In short, there was corroborated evidence that Petitioner, at a minimum: (1) was recognized as belonging to a gang and went by the name "Bang;" (2) socialized with members of the Imperial Block Crips, who were not only on friendly terms with the 118 East Coast Crips, but eventually "merged" with the 118 East Coast Crips; (3) knew Pugh and had associated with him prior to the incident; (4) was part of the group that approached the bus stop and waited for MTA route 53 to arrive; (4) joined the group that ran towards the bus after Pugh yelled, "Y'all ready;" (5) was near the back of the bus during the shooting; and (6) fled the scene with the same group that had waited for, rushed, and entered the bus following the shooting.

Given this evidence, which the prosecution developed without any of the alleged Brady material, the Court concludes that there existed a sufficient basis upon which the jury could find that Petitioner intended, at a minimum, to support the assault of the Bloods aboard MTA bus 53.  For this reason, the Court rejects Petitioner's argument that there was insufficient evidence to support his conviction.

1        C.      Constitutionality of California Penal Code Section 12022(a)(1)

2        Petitioner contends that California Penal Code section 12022(a)(1) unconstitutionally

3   dispenses with a scienter requirement.  The Supreme Court has stated "that offenses that

4   require no <u>mens rea</u> generally are disfavored."  <u>Staples v. United States</u>, 511 U.S. 600, 606,

5   114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608 (1994).  Nevertheless, criminal offenses can

6   dispense with a scienter requirement.  In such instances, "some indication of congressional

7   intent, express or implied, is required to dispense with <u>mens rea</u> as an element of a crime."

8   <u>Id.</u>  In evaluating the California Legislature's intent in adopting Penal Code section

9   12022(a)(1), the California Court of Appeal has concluded "that the legislative intent

10  underlying the scheme was not 'to impose a scienter burden upon the prosecution to prove

11  that a principal knew or should have known that his confederate in the commission of a

12  felony was carrying a firearm.'"  <u>People v. Overten</u>, 28 Cal. App. 4th 1497, 1502, 35 Cal.

13  Rptr. 2d 232, 234 (1994) (quoting <u>People v. McGreen</u>, 107 Cal. App. 3d 504, 524-25, 166

14  Cal. Rptr. 360, 371 (1980)).  The Court therefore concludes that the enhancement of

15  Petitioner's sentence based on California Penal Code section 12022(a)(1) was constitutional.

16       D.      Constitutionality of CALJIC Instruction No. 2.90

17       Petitioner argues that CALJIC Instruction No. 2.90's reasonable doubt instruction

18  violates the constitution because it fails to require the prosecution to prove each element of

19  an offense beyond a reasonable doubt.  Petitioner's claim has been routinely rejected by both

20  California and Federal courts.  <u>See</u> <u>People v. Hearon</u>, 72 Cal. App. 4th 1285, 1286, 85 Cal.

21  Rptr. 2d 424 (1999) ("In a well-worn argument that has become the soup du jour of

22  appellate advocacy in criminal cases, defendant . . . claims the definition of reasonable doubt

23  given to the jury in accordance with . . . CALJIC No. 2.90 is 'defective in that it gave the

24  jury no guidance as to the level of certainty to which it must be persuaded before it could

25  reliably determine that the prosecution had met its burden of proof beyond a reasonable

26  doubt.'"); <u>see also</u> <u>Drayden v. White</u>, 232 F.3d 704, 715 (9th Cir. 2000) (rejecting

27  constitutional claim based on CALJIC No. 2.90 because "the Supreme Court has upheld the

28  instruction as constitutional."); <u>Lisenbee v. Henry</u>, 166 F.3d 997, 999-1000 (9th Cir. 1999).

1   CALJIC No. 2.90 does not unconstitutionally modify the reasonable doubt standard.  For

2   this reason, the Court rejects Petitioner's constitutional challenge to his conviction based on

3   the jury instructions.

4   III.    Conclusion

5          For all the foregoing reasons, the Court denies Randall Amado's Petition for Writ of

6   Habeas Corpus by a Person in State Custody.

7          IT IS SO ORDERED.

8   DATED:  July 20, 2011

9

10                                                              Percy Anderson
                                                        UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-17-